# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

***Kafin v. Division of Professional Regulation of the Department of Financial & Professional Regulation**, 2012 IL App (1st) 111875*

---

| | |
|---|---|
| Appellate Court Caption | WILLIAM JOEL KAFIN, Plaintiff-Appellant, v. THE DIVISION OF PROFESSIONAL REGULATION OF THE DEPARTMENT OF FINANCIAL AND PROFESSIONAL REGULATION; and JAY STEWART, Director of the Division, Defendants-Appellees. |
| District & No. | First District, Sixth Division<br>Docket No. 1-11-1875 |
| Filed<br>Rehearing denied | May 17, 2012<br>June 27, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The decision of the Director of the Division of Professional Regulation revoking plaintiff psychiatrist's medical license was reversed and the cause was remanded for a reexamination of the overly severe punishment, since the psychiatrist was grossly negligent when he entered into a sexual relationship with a patient, his conduct was dishonorable, immoral, unethical and unprofessional, and the administrative law judge acted properly in not considering the testimony of an expert witness that called for a legal conclusion, but the revocation of plaintiff's license was disproportionate to the alleged offense, especially in view of the mitigating circumstances that plaintiff did not suffer from a psychiatric illness and would be fit to practice medicine, provided he complied with specific recommendations. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CH-03972; the Hon. Lee Preston, Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed in part and reversed in part; cause remanded with instructions. |
| Counsel on Appeal | Goldberg Law Group, LLC, of Chicago (Michael K. Goldberg and Robert A. Bauerschmidt, of counsel), for appellant. |
| | Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Laura Wunder, Assistant Attorney General, of counsel), for appellees. |
| Panel | JUSTICE LAMPKIN delivered the judgment of the court, with opinion. Presiding Justice R. Gordon and Justice Garcia concurred in the judgment and opinion. |

## OPINION

¶ 1    Plaintiff Doctor William Joel Kafin, a psychiatrist, appeals from an order of the circuit court denying his complaint for administrative review and affirming the decision entered by the Director of the Division of Professional Regulation (Director) of the Illinois Department of Financial and Professional Regulation (Department) to revoke plaintiff's controlled substance license and certificate of registration as a physician and surgeon (collectively, medical license). Plaintiff contends that the Director's decision must be reversed because: (1) plaintiff's right to due process was violated where no member of the Illinois Medical Disciplinary Board (Board) was present at his formal administrative hearing; (2) the administrative law judge admitted improper testimony from the Department's expert witness; and (3) the revocation of his medical license is disproportionate discipline to the alleged offense.

¶ 2    For the reasons that follow, we agree with plaintiff that the revocation of his license was an abuse of discretion and remand this cause for the imposition of a sanction. In all other respects, we affirm the circuit court's order confirming the Director's decision.

¶ 3                    BACKGROUND

¶ 4    Plaintiff is a psychiatrist who was licensed by the Department in 1980. On May 14, 2007, the Department received a mandatory report alleging that plaintiff caused emotional distress to his patient, L.F., by providing negligent counseling. The report was filed with the Department after L.F. filed a lawsuit against plaintiff.

¶ 5    On September 28, 2007, the Department filed a formal complaint against plaintiff, alleging he had violated the Medical Practice Act of 1987 (Act) (225 ILCS 60/1 to 63 (West 2006)) by engaging in a personal and sexual relationship with L.F. The Department amended

its complaint on January 15, 2009. In its amended complaint, the Department claimed that plaintiff violated the Act because his actions constituted: "gross negligence in practice" (count I); "dishonorable, unethical, or unprofessional conduct of a character likely to deceive, defraud or harm the public" (count II); and "immoral conduct" (count III). See 225 ILCS 60/22(A)(4), (5), (20) (West 2006). The Department sought that plaintiff's medical license be revoked or suspended or that plaintiff be placed on probation or otherwise disciplined.

¶ 6　　　Prior to a formal administrative hearing, plaintiff underwent a multidisciplinary team (team) assessment that evaluated his mental health and fitness as a psychiatrist. The team prepared a written assessment report of its findings. The assessment report was approved by Doctor John Larson, a psychiatrist and member of the team.

¶ 7　　　The administrative hearing was held on February 4, February 23 and March 2, 2010. Testimonial evidence was presented to the administrative law judge on the first two hearing dates. Before the start of the hearing on both of those dates, plaintiff objected to proceeding with the presentation of witness testimony on the grounds that no Board members were present at the hearing. The Department responded that Board members were not required to personally attend the hearing. The administrative law judge agreed with the Department and overruled plaintiff's objection.

¶ 8　　　At the hearing, the Department presented L.F.'s and plaintiff's testimony and the expert testimony of Doctor Larson. The Department also presented documentary evidence, including the assessment report and e-mail correspondence between plaintiff and L.F.

¶ 9　　　L.F. testified that she was 19 years old in December 2001, when her parents finalized their divorce and she began to feel lonely and experience mood instability. L.F. began to seek psychiatric treatment. On March 18, 2002, L.F. met plaintiff (age 58) and plaintiff prescribed pyschotropic medication for her. In April 2002, L.F. began therapy sessions with plaintiff twice a week. L.F. said that during the first month of her treatment her sessions started at 5 p.m. As L.F.'s treatment progressed, upon plaintiff's recommendation, her sessions began to be scheduled later in the evening. There were no other people present in plaintiff's office in the evenings, including plaintiff's wife, who was the office manager. L.F. said that during her sessions plaintiff talked about his personal life and expressed dissatisfaction with his wife and children. Plaintiff did not take notes during the sessions and was critical of the college L.F. attended. L.F. said that she had concerns that therapy sessions with plaintiff were not in her best interest but she continued to see him because she "wanted to feel connected."

¶ 10　　　During a therapy session in November 2002 plaintiff told L.F. that he had strong feelings for her, wanted to enter into a social relationship with her and that he could no longer treat her as a patient. Plaintiff and L.F., then 20 years old, entered into a social relationship in December 2002. Plaintiff referred L.F. to another therapist but continued to prescribe medication for her during their relationship.

¶ 11　　　L.F.'s and plaintiff's social activities included exchanging e-mail and text messages, some of which were sexually suggestive, and going to restaurants and bars. L.F. said plaintiff gave her a "fake ID" and purchased alcohol for her. He also gave her marijuana and samples of prescription medications. On one occasion, plaintiff smoked marijuana with L.F. L.F. said that, on more than one occasion, she accompanied plaintiff on his medical rounds at nursing

homes and that plaintiff told the staff of the nursing homes that she was his "intern."

¶ 12    In late December 2002, plaintiff asked L.F. to stay with him at a hotel. L.F. agreed and stayed with plaintiff for three nights at the hotel. During this time, plaintiff slept in the same bed as L.F. and the pair engaged in sexual activity, including kissing and touching of genitals. L.F. said that on the second night plaintiff gave her two sleeping pills, "Ambien," which she took. She said that initially she could not remember what happened that night, but she was able to recall in "flashbacks" the next morning that they had engaged in sexual activity.

¶ 13    In January 2003, plaintiff moved out of the house he shared with his wife and into his son's apartment. During that month, L.F. alternated between sleeping at plaintiff's son's apartment and her mother's house. L.F. said that during this time, plaintiff and she engaged in sexual intercourse on about 5 to 10 occasions. She explained that, although plaintiff could not maintain an erection due to erectile dysfunction, vaginal penetration occurred for about 30 seconds at a time.

¶ 14    L.F. testified that in February 2003, she began to have less physical contact with plaintiff. The pair continued to exchange e-mails and text messages, some of which were sexually suggestive, until April 2003. Around that time, their contact became more sporadic. L.F. saw plaintiff for the last time in July 2003 when the pair had lunch together. She said that during lunch plaintiff tried to play "footsy" with her under the table. L.F. refused and did not see plaintiff again. L.F. said that before she began treatment with plaintiff she lived with her mother, attended college, had a boyfriend and was employed. After treatment, L.F. was single, unemployed, had left the college she was attending and felt alienated from her friends.

¶ 15    Plaintiff testified that he had been practicing psychiatry for 27 years. Plaintiff met L.F. in March 2002, when she sought medication management for her anxiety and mood instability. Plaintiff began to treat L.F. in April 2002, with the pair meeting for therapy twice a week in plaintiff's office. Plaintiff acknowledged that his treatment notes about L.F. stop in March 2002 and resume in November 2002. He explained that sometime during the summer of 2002, he developed feelings for L.F. and could no longer treat her objectively. Plaintiff said that in November 2002, he terminated his professional relationship with L.F. and referred her to another therapist for treatment. Plaintiff acknowledged that, in response to the lawsuit filed by L.F., he wrote a letter to the Department addressing the extent of his relationship with L.F. Plaintiff said in the letter that he terminated his relationship with L.F. because it became apparent to him that she had focused her personal attention on him. Plaintiff testified that in the letter he did not report to the Department that he also had feelings for L.F. because he "wasn't professionally suicidal."

¶ 16    In December 2002, plaintiff and L.F. entered into a social and personal relationship. Plaintiff acknowledged that at the time he knew it was unprofessional to have a social, personal, romantic or sexual relationship with a current or former patient and that his relationship with L.F. was a boundary violation. He attributed this violation to his exercise of poor judgment. Plaintiff said he could not control L.F., who he described as "aggressive" and a "bulldog." He acknowledged that in December 2002 he slept in the same bed as L.F. in a hotel and that "there was some fooling around like men and women do" but denied

having sex with L.F. Plaintiff also acknowledged that he slept in the same bed as L.F. at his son's apartment in January 2003 and that he had physical contact with her at the time but denied that it was sexual in nature. Plaintiff acknowledged that he held, hugged and kissed L.F. but denied that his penis ever penetrated her vagina.

¶ 17    Plaintiff also acknowledged that he bought alcohol for L.F. but denied obtaining a fake identification card for her, ordering alcohol at restaurants for her and smoking marijuana with her. Plaintiff further acknowledged that he took L.F. on his medical rounds but denied that he introduced her to his patients as his "intern." He said he introduced her as his "helper." Plaintiff also acknowledged exchanging e-mails and text messages with L.F. He attributed the sexually suggestive language in some of the e-mails to "poetic license." Plaintiff said that he continued to prescribe medication for L.F. even after terminating his professional relationship with her because she resisted seeing another therapist and it would take "too long for her to get connected with a new psychiatrist." Plaintiff last contacted L.F. in July or August 2003, when he was contacted by her attorney.

¶ 18    Plaintiff described his multidisciplinary professional assessment as a "snow job" and said he did not "respect the process." He also said that he had not fulfilled most of the recommendations of the team because they were just "recommendation[s]." Plaintiff explained that he did not participate in the Illinois Professionals Health Program (IPHP), a statewide program designed to guide healthcare professionals, or take an intensive course on maintaining boundaries as recommended by the team because he considered understanding boundaries to be one of his strengths. When asked if he would take a boundary course, plaintiff responded, "I don't think boundary is a relevant issue." Plaintiff acknowledged that he played tennis and basketball with one of his patients because the patient is a "tremendous athlete." Plaintiff said he would be willing to take a course on boundaries if the course was on a weekend and did not interfere with his practice.

¶ 19    Doctor John Larson, a practicing psychiatrist and a member of the team that evaluated plaintiff, testified as an expert qualified to provide an opinion about whether or not boundary violations occurred in this case. Larson interviewed plaintiff for about an hour. Larson said that during the interview, plaintiff told him that he knew as of his third session with L.F. that their relationship was going to be difficult for him and that he should have referred her to another therapist at that point. Plaintiff also told Larson that he had sexual contact with L.F. Plaintiff acknowledged to Larson that he "definitely stepped over the line" in his relationship with L.F.

¶ 20    Doctor Larson explained the importance of preserving boundaries in the psychiatrist-patient relationship due to the power imbalance inherent in the relationship. He also explained the difficulty of treating patients who have lost trust in a psychiatrist because of a boundary violation. Larson said it is a violation of acceptable boundaries for a psychiatrist to disclose personal information to a patient, meet a patient outside the office or have a sexual relationship with a current or former patient. Larson opined that boundary violations occurred in this case regardless of whether plaintiff was actively providing therapy to L.F. at the time of their relationship. He explained that a psychiatrist-patient relationship exists when a physician is prescribing medication to a person, even if the psychiatrist is not providing other medical services to the person.

¶ 21    Doctor Larson approved a written assessment report of the team's findings and testified to its contents. The team concluded in the assessment report that plaintiff did not suffer from a psychiatric illness but did exhibit several key features of a narcissistic personality disorder. Namely, plaintiff displayed a sense of entitlement, demonstrated interpersonal exploitation of his relationship with L.F., lacked empathy for her and denied that his behavior could have harmed her in any way. Larson said plaintiff spent a considerable amount of time blaming L.F. for their relationship and believed that she had taken advantage of him. In the assessment report, the team noted that plaintiff had no insight into the egregious nature of his behavior with L.F. and at "no point did he acknowledge the harm he may have done" to her. The team also noted that "there is no evidence that plaintiff had resolved the issues and attitudes that led to this evaluation."

¶ 22    The team concluded that plaintiff is fit to practice medicine provided that he comply with the following recommendations: come under the auspices of the IPHP; complete an intensive boundaries course approved by the IPHP and provide evidence of his successful completion of the course; engage in intensive psychotherapy with a therapist experienced in working with professionals, boundary issues and people with narcissistic traits; have another psychiatrist meet with him on a regular basis to monitor his practice, review patient care and assist him in understanding and avoiding boundary violations; and come under the formal care of a primary physician for his medical needs.

¶ 23    During Doctor Larson's testimony, the Department asked him a series of questions about whether certain conduct with a patient, *i.e.,* sleeping in the same bed, vaginal penetration, sexual touching, consuming alcohol, smoking marijuana, obtaining a fake identification card and sending suggestive e-mails, would be unethical, unprofessional or dishonorable. Plaintiff made a standing objection to this line of questioning on the basis that Larson was not qualified to make legal determinations. The administrative law judge overruled the objection and Larson answered each question in the affirmative.

¶ 24    After the hearing, plaintiff filed a motion to strike portions of Doctor Larson's testimony, arguing that his testimony called for a legal conclusion as to whether plaintiff violated the Act. After hearing argument on the motion, the administrative law judge deferred ruling on the motion until his written report and recommendation were filed.

¶ 25    On April 13, 2010, the administrative law judge issued a written report and recommendation. In the report, the judge addressed plaintiff's motion to strike portions of Doctor Larson's testimony and noted that much of Larson's testimony was proper as it concerned plaintiff's duties and responsibilities to his patients. The judge observed that only two questions called for Larson to make a legal conclusion–those concerning whether plaintiff's actions constituted dishonorable, unethical or unprofessional conduct–and noted that he would not consider that portion of Larson's testimony. After summarizing the facts and evidence presented, the judge found that the Department proved by clear and convincing evidence that plaintiff violated sections 22(a)(4), (5) and (20) of the Act because he: (1) committed gross negligence in his treatment of L.F.; (2) engaged in dishonorable, unethical or unprofessional conduct of a character likely to deceive, defraud or harm the public; and (3) engaged in immoral conduct in his treatment of L.F. The judge recommended that plaintiff's medical license be indefinitely suspended for at least three years and that plaintiff

be fined $5,000.

¶ 26    On July 7, 2010, "after reviewing the record in [the] matter," the Board made findings of fact, conclusions of law and a recommendation to the Director. The Board adopted the findings of fact and conclusions of law as contained in the report and recommendation of the administrative law judge and recommended the same penalty. Plaintiff filed a motion seeking rehearing, arguing that Doctor Larson's testimony was improper and that the penalty imposed was too severe.

¶ 27    The Director issued a final administrative decision on January 28, 2011. The Director found that oral argument on plaintiff's motion for rehearing was unnecessary and, after finding that plaintiff failed to allege new evidence to warrant a rehearing, denied the motion. The Director then adopted the findings of fact and conclusions of law of the Board but rejected, in part, the Board's recommendation. After reviewing the record, the Director noted that the "egregious nature of plaintiff's conduct, coupled with his lack of candor and seemingly indifferent attitude towards the seriousness of his actions, warrants a proportionately severe discipline." The Director revoked plaintiff's medical license and assessed a $5,000 fine.

¶ 28    Plaintiff filed a complaint for administrative review in the circuit court on February 1, 2011. Plaintiff alleged that the Director's decision should be reversed because: (1) a Board member was required to be present at his administrative hearing; (2) the decision was based on improper testimony from Doctor Larson; and (3) the penalty assessed was too severe. Plaintiff also sought to stay enforcement of the Director's decision. The court granted plaintiff's motion to stay pending its ruling. On July 6, 2011, the circuit court entered a written order affirming the decision of the Director. Plaintiff appeals, raising the same three arguments he raised in the circuit court.

¶ 29                                    ANALYSIS

¶ 30    Plaintiff first contends that the Director's decision must be reversed because plaintiff's right to due process was violated where no member of the Board was present at his administrative hearing. He argues that as a matter of law at least one Board member must be present during the hearing. In support of this argument, plaintiff relies on our supreme court's decision in *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76 (1992), and the language of the Act. The State responds that plaintiff failed to preserve this issue for appeal because he did not raise it before the Director. Since plaintiff raised the issue at the administrative hearing and the Director reviewed the transcript of the hearing, we will review the issue on the merits.

¶ 31    The Act provides that all final administrative decisions of the Department are subject to review under the Administrative Review Law (see 735 ILCS 5/3-101 to 3-113 (West 2008)). 225 ILCS 60/41 (West 2008). Pursuant to administrative review law, we review the administrative agency's decision, not the circuit court's determination. *Anderson v. Department of Professional Regulation*, 348 Ill. App. 3d 554, 560 (2004). Where, as here, the issue involves a question of law, we apply a *de novo* standard of review. *Anderson*, 348 Ill. App. 3d at 560.

¶ 32    In *Abrahamson*, our supreme court said:

"It is settled that, absent express statutory language to the contrary, agency members making the final decision need not be present when the evidence is taken, so long as they review the record of proceedings. [Citiation.] Further, we agree with the appellate court, which has applied these principles to administrative proceedings under the Act. The court has specifically said that it is sufficient if even only one Board member listened to the live testimony. Procedural due process is afforded where the absent Board members reviewed the transcript before making findings and recommendations. [Citation.]" *Abrahamson*, 153 Ill. 2d at 95-96.

Plaintiff interprets this language to mean that at least one Board member must be present at an administrative hearing.

¶ 33    However, the *Abrahamson* court did not say that due process is violated if no Board members are present at an administrative hearing. Rather, the court in *Abrahamson* found it sufficient that only one Board member "listened to" the live testimony. In reaching this finding, the court noted that "absent express statutory language to the contrary, agency members making the final decision need not be present when the evidence is taken, so long as they review the record of proceedings." *Abrahamson*, 153 Ill. 2d at 95-96. Given this language, we believe the *Abrahamson* decision supports the conclusion that, "absent express statutory language to the contrary," Board members need not be present when the evidence is taken "so long as they review the record of proceedings" before rendering their recommendation. *Abrahamson*, 153 Ill. 2d at 95-96. Here, the Act does not contain language requiring Board members to be present at an administrative hearing and the record shows the Board members reviewed the transcript of plaintiff's administrative hearing before making their recommendation to the Director. Accordingly, plaintiff's right to due process was not violated.

¶ 34    In reaching this conclusion, we are unpersuaded by plaintiff's argument that section 37 of the Act suggests that Board members must be present during the disciplinary hearing. Section 37 provides:

"At the time and place fixed in the notice, the Disciplinary Board provided for in this Act shall proceed to hear the charges and both the accused person and the complainant shall be accorded ample opportunity to present in person, or by counsel, such statements, testimony, evidence and argument as may be pertinent to the charges or to any defense thereto. The Disciplinary Board may continue such hearing from time to time. If the Disciplinary Board is not sitting at the time and place fixed in the notice or at the time and place to which the hearing has been continued, the Department shall continue such hearing for a period not to exceed 30 days." 225 ILCS 60/37 (West 2008).

We cannot say that this section contains "express statutory language" that at least one Board member must be present at an administrative hearing.

¶ 35    We also cannot say that section 37 would be rendered meaningless if the hearing could proceed with no members of the Board being present. It is well settled that a board may "hear" evidence as provided in section 37 by reviewing the transcript of proceedings presided over by a hearing officer. See *Morgan v. United States*, 298 U.S. 468, 481-82 (1936)

(discussing what it means for administrative decisionmakers to "hear" evidence); *Homefinders, Inc. v. City of Evanston*, 65 Ill. 2d 115, 128 (1976) ("[t]he requirements of due process are met if the decision-making board considers the evidence contained in the report of proceedings before the hearing officer and bases its determinations thereon"); *Bruns v. Department of Registration & Education*, 59 Ill. App. 3d 872, 875 (1978) ("members of a board charged with ultimate decision-making authority need not personally hear the evidence in order for their determination to be valid"); *Lloyd A. Fry Roofing Co. v. Pollution Control Board*, 20 Ill. App. 3d 301, 310-11 (1974) (due process satisfied where the Pollution Control Board considered and appraised the evidence, regardless of whether any board members personally heard testimony).

¶ 36        Construing the Act as a whole further supports the conclusion that no Board members need to be present at the hearing and that due process is not violated as long as the Board members review the record of proceedings before rendering their recommendation. See *State Building Venture v. O'Donnell*, 239 Ill. 2d 151, 160 (2010) (if the language of a statute is ambiguous a reviewing court must construe the statute as a whole). Section 35 provides:

> "The Director shall have the authority to appoint an attorney duly licensed to practice law in the State of Illinois to serve as the hearing officer in any action to suspend, revoke, place on probationary status, or take any other disciplinary action with regard to a license. The hearing officer shall have full authority to conduct the hearing. The hearing officer shall report his findings and recommendations to the Disciplinary Board within 30 days of the receipt of the record. The Disciplinary Board shall have 60 days from receipt of the report to review the report of the hearing officer and present their findings of fact, conclusions of law and recommendations to the Director." 225 ILCS 60/35 (West 2008).

This section does not require that a Board member be present at a plaintiff's hearing. Rather, section 35 affords the hearing officer "full authority to conduct the hearing" and requires him to "report his findings and recommendations to the Disciplinary Board within 30 days of the receipt of the record." 225 ILCS 60/35 (West 2008). The Board then has 60 days to present its findings of fact, conclusions of law and recommendation to the Director. 225 ILCS 60/35 (West 2008). These statutory procedures were followed in this case and plaintiff's right to due process was not violated.

¶ 37        Plaintiff next contends that the Director's decision must be reversed because the administrative law judge admitted improper testimony from Doctor Larson. Plaintiff claims that Larson's testimony that plaintiff's actions violated the rules of professional conduct was inadmissible because Larson was not qualified to make these legal determinations.

¶ 38        An administrative decision will not be overturned because the administrative judge failed to observe the rules of evidence unless the error "materially affected the rights of any party and resulted in substantial injustice to [the party]." 735 ILCS 5/3-111(b) (West 2008); *Matos v. Cook County Sheriff's Merit Board*, 401 Ill. App. 3d 536, 541 (2010) (an evidentiary ruling, even if incorrect, will not be reversed unless there is "demonstrable prejudice to the complaining party").

¶ 39        Here, plaintiff was not prejudiced by Doctor Larson's testimony. The record clearly shows that the administrative law judge properly observed the rules of evidence and did not

consider portions of Larson's testimony that called for Larson to make a legal conclusion. In his written report, the judge addressed plaintiff's motion to strike Larson's testimony. The judge noted that much of Larson's testimony was proper as it concerned plaintiff's duties and responsibilities to his patients. The judge observed that only two questions called for Larson to make a legal conclusion and noted that he would not consider that portion of Larson's testimony. Accordingly, plaintiff's argument dos not provide us with a basis to overturn the administrative decision. See 735 ILCS 5/3-111(b) (West 2008).

¶ 40    Even were we to assume that the judge erred in admitting other portions of Larson's testimony, the error was not prejudicial to plaintiff given the overwhelming evidence presented against him. The record shows plaintiff had sexual relations with L.F., provided her with a fake identification card, purchased alcohol for her, smoked marijuana with her, pretended that she was his intern and exchanged sexually suggestive e-mails with her. Plaintiff did all this while continuing to prescribe medication for L.F.

¶ 41    Plaintiff finally contends that the revocation of his medical license was disproportionate discipline to the alleged offense. He claims that in other similar cases in which psychiatrists entered into sexual relationships with their patients, the psychiatrists' licenses were suspended for shorter periods of time.

¶ 42    We review the Director's disciplinary decision for an abuse of discretion. *Reddy v. Department of Professional Regulation*, 336 Ill. App. 3d 350, 354 (2002). An abuse of discretion occurs only when the decision was either: " '(1) overly harsh in view of the mitigating circumstances or (2) unrelated to the purpose of the statute.' " *Reddy*, 336 Ill. App. 3d at 354 (quoting *Siddiqui v. Department of Professional Regulation*, 307 Ill. App. 3d 753, 763 (1999)). The purpose of the Act is to protect the public health and welfare from those not qualified to practice medicine. *Reddy*, 336 Ill. App. 3d at 354. A "reviewing court defers to the administrative agency's expertise and experience in determining what sanction is appropriate to protect the public interest." *Abrahamson*, 153 Ill. 2d at 99.

¶ 43    We first examine whether the punishment was overly harsh, arbitrary, or unreasonable in view of mitigating circumstances. *Reddy*, 336 Ill. App. 3d at 355. Prior cases with facts similar to those in the case at bar are instructive in this analysis. In *Reddy*, a psychiatrist professed his love for his patient during a psychiatric treatment session, moved her into the home that he shared with his wife and children, divorced his wife, and proceeded to marry his patient. *Reddy*, 336 Ill. App. 3d at 352. The marriage lasted about one year. *Reddy*, 336 Ill. App. 3d at 352. The Department, having adopted the findings of the administrative law judge, concluded that the psychiatrist's behavior warranted discipline because the evidence showed that the psychiatrist's behavior was unethical, unprofessional, and immoral under the Medical Practice Act. *Reddy*, 336 Ill. App. 3d at 355 (citing 225 ILCS 60/22(A) (West 2000)). The Department also found that the evidence showed that the psychiatrist suffered from a mental illness that resulted in his inability to practice medicine with a reasonable degree of judgment under the Medical Practice Act. *Reddy*, 336 Ill. App. 3d at 355 (citing 225 ILCS 60/22(A) (West 2000)).

¶ 44    After the administrative hearing, the administrative law judge made the above findings of fact and law and recommended that the psychiatrist's medical license should be placed on

two years' probation "with certain restrictions on [the psychiatrist's] practice of medicine." *Reddy*, 336 Ill. App. 3d at 352. The Board accepted all of the administrative law judge's findings, but chose to recommend a more severe penalty than recommended by the judge. *Reddy*, 336 Ill. App. 3d at 352. The Board determined that a six-month suspension of the psychiatrist's medical license was an appropriate punishment, due to the "egregious" nature of the psychiatrist's offense. *Reddy*, 336 Ill. App. 3d at 352. The Department accepted the Board's recommendation and issued an order suspending the psychiatrist's medical license for six months. *Reddy*, 336 Ill. App. 3d at 352. The Department also prohibited the psychiatrist from supervising other medical practitioners. *Reddy*, 336 Ill. App. 3d at 352. The Fourth District Appellate Court affirmed the Department's order and held that the Department did not abuse its discretion in imposing the six-month suspension. *Reddy*, 336 Ill. App. 3d at 355.

¶ 45    Unlike the case at bar, the Department determined that the psychiatrist in *Reddy* did suffer from a mental illness that resulted in his inability to practice with a reasonable degree of judgment. *Reddy*, 336 Ill. App. 3d at 355 (citing 225 ILCS 60/22(A)(27) (West 2000)). In this case, the team of psychiatrists who evaluated plaintiff concluded that he did not suffer from a psychiatric illness, but the team concluded that plaintiff exhibited several key features of a narcissistic personality disorder. The team of psychiatrists also determined that plaintiff would be fit to practice medicine, provided he complied with specific recommendations.

¶ 46    In both *Reddy* and the case at bar, the Department characterized the psychiatrists' actions as "egregious" and stated that stiffer sanctions than those proposed by lower administrative agencies[1] were necessary in light of such egregious behavior. *Reddy*, 336 Ill. App. 3d at 352. Here, the Director determined that the "egregious nature of plaintiff's conduct, coupled with his lack of candor and seemingly indifferent attitude towards the seriousness of his actions, warrants a proportionately severe discipline." The Director then rejected the Board's recommendation that plaintiff's license be indefinitely suspended for at least three years and revoked plaintiff's medical license. We agree that plaintiff's behavior was egregious, but we do not believe that it was so different from *Reddy* as to merit revocation of his license.

¶ 47    Other cases in which medical practitioners have been found to engage in egregious conduct likely to "harm the public" have imposed sentences similar to the one given in *Reddy*. For example, in *Pundy v. Department of Professional Regulation*, 211 Ill. App. 3d 475, 479 (1991), a psychiatrist began a sexual relationship with one of his patients. During the course of their relationship, the psychiatrist hired the patient to work in his office, eventually allowing her to act as a "co-therapist," meaning that the psychiatrist allowed her to be present during other patients' psychiatric sessions. *Pundy*, 211 Ill. App. 3d at 479. The parties' testimony regarding the sequence of events in the relationship conflicted, but both the psychiatrist and the patient testified that the pair engaged in a sexual relationship after the psychiatrist-patient relationship began and that the psychiatrist hired the patient to work

---

[1] The ALJ in *Reddy* proposed a lighter punishment, but the Board recommended stiffer penalties. In this case, the ALJ proposed a lighter punishment, and the Board agreed, but the Department chose to impose stiffer penalties.

for him, and eventually allowed her to act as a "co-therapist." *Pundy*, 211 Ill. App. 3d at 479. During the administrative hearing, a board-certified psychiatrist testified as an expert witness on behalf of the Department. *Pundy*, 211 Ill. App. 3d at 479-80. Like in the instant case, the expert testified that the psychiatrist failed to recognize the results of his behavior, which led to the psychiatrist breaching his duty to his patient.[2] *Pundy*, 211 Ill. App. 3d at 479-80.

¶ 48    The administrative law judge determined that there was no credible evidence to support a finding of a clear and convincing violation of the Medical Practice Act and recommended that no punishment be imposed. *Pundy*, 211 Ill. App. 3d at 480. However, the Board declined to follow the judge's recommendation and found that the psychiatrist was guilty of unprofessional conduct likely to harm the public. *Pundy*, 211 Ill. App. 3d at 480. The Board recommended that the Department suspend the psychiatrist's medical license for six months, followed by a two-year probationary period. *Pundy*, 211 Ill. App. 3d at 480. The Department accepted the Board's recommendations and ordered the punishment recommended. *Pundy*, 211 Ill. App. 3d at 480.

¶ 49    The psychiatrist argued on appeal that the sentence was arbitrary and overly harsh. *Pundy*, 211 Ill. App. 3d at 488. He maintained that he had been exploited by his patient, much like plaintiff maintains that his problems are the fault of L.F. *Pundy*, 211 Ill. App. 3d at 488. The *Pundy* psychiatrist also claimed that he had taken steps to mitigate any harm done to his patient by terminating the psychiatrist-patient relationship.[3] *Pundy*, 211 Ill. App. 3d at 488. We found that the Department did not abuse its discretion in suspending the psychiatrist. *Pundy*, 211 Ill. App. 3d at 488. We stated that even in light of any mitigation, the six-month suspension and two-month probationary period were not overly harsh. *Pundy*, 211 Ill. App. 3d at 488. In fact, in finding that the punishment was not arbitrary or overly harsh, we specifically pointed out that the Department did not revoke the psychiatrist's license. *Pundy*, 211 Ill. App. 3d at 488. Instead, this court found that the Department "merely" suspended the psychiatrist's license for six months and imposed a subsequent two-year probationary period, suggesting that a revocation would have been too harsh in light of the psychiatrist's actions. *Pundy*, 211 Ill. App. 3d at 488.

¶ 50    Based on the punishments imposed in these similar cases, we find that plaintiff's

---

[2]In *Pundy*, multiple psychiatrists testified as expert witnesses on behalf of the plaintiff psychiatrist. *Pundy*, 211 Ill. App. 3d at 480. These experts disagreed with the Department's expert's findings that the plaintiff psychiatrist failed to recognize the results of his behavior. The experts further testified that the plaintiff psychiatrist had not violated any medical ethics by entering into a sexual relationship with his patient. *Pundy*, 211 Ill. App. 3d at 480. This court pointed out in a footnote that subsequent to the hearing, the Illinois legislature passed "An Act Concerning Sexual Exploitation by Psychotherapists." *Pundy*, 211 Ill. App. 3d at 480 n.1 (citing Ill. Rev. Stat. 1989, ch. 70, ¶¶ 801 to 807 (now see 740 ILCS 140/0.01 to 7 (West 2006))). This Act creates a cause of action against psychotherapists who engage in sexual relations with their patients.

[3]The psychiatrist's testimony conflicted with that of the patient, who claimed that although their structured therapy appointments ceased, they continued to have "continuous, free-floating" therapy sessions. *Pundy*, 211 Ill. App. 3d at 479.

punishment was overly harsh in light of the mitigating circumstances. Although plaintiff's actions were certainly egregious, they are not so different from the actions of the psychiatrists in *Reddy* and *Pundy* as to merit revocation of his license.

¶ 51 Finally, we consider whether the punishment was unrelated to the purpose of the statute. The purpose of the Medical Practice Act is to "protect the public health and welfare from those not qualified to practice medicine." *Ikpoh v. Department of Professional Regulation*, 338 Ill. App. 3d 918, 926 (2003). The experts assigned to evaluate plaintiff concluded that he would be fit to practice medicine, provided he complied with their recommendations. Therefore, revoking plaintiff's license in spite of the assessment that he *is* fit to practice medicine under certain conditions runs counter to the statute's intended purpose of protecting the public from those *not* qualified to practice medicine. This reasoning is reflected in *Pundy*, in which this Court pointed out that the suspension was imposed because the psychiatrist engaged in "conduct likely to harm the public." *Pundy*, 211 Ill. App. 3d at 488. This court then found that the suspension was directly related to the purpose of the statute because during the period of the psychiatrist's suspension and probation, he was to receive therapy in order to prevent that conduct from occurring again. *Pundy*, 211 Ill. App. 3d at 488. Once the suspension was completed, the psychiatrist would be deemed fit to practice medicine. *Pundy*, 211 Ill. App. 3d at 488. In this case, the original punishment recommended by the administrative law judge, a three-year suspension, would have provided plaintiff with time to complete the recommendations provided by the team of experts and render him fit to practice medicine. Therefore, the Director's revocation of plaintiff's license runs counter to the purpose of the statute.

¶ 52 CONCLUSION

¶ 53 For the reasons stated, we reverse the circuit court's order confirming the Director's decision to revoke plaintiff's medical license. We remand this cause with instructions for the Department to reexamine its overly severe punishment. Aside from the revocation issue, we affirm the circuit court's order confirming the Director's decision with regard to the other issues raised by plaintiff.

¶ 54 Affirmed in part and reversed in part; cause remanded with instructions.