# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**All American Title Agency, LLC v. Department of Financial & Professional Regulation,**
**2013 IL App (1st) 113400**

---

| | |
|---|---|
| Appellate Court Caption | ALL AMERICAN TITLE AGENCY, LLC, and TITLE ZONE, LLC, Plaintiffs-Appellants, v. THE DEPARTMENT OF FINANCIAL AND PROFESSIONAL REGULATION; BRENT ADAMS, Secretary of the Department of Financial and Professional Regulation; and HARRY STIRMELL, Supervisor of the Title Insurance Section of the Department of Financial and Professional Regulation, Defendants-Appellees. |
| District & No. | First District, Second Division<br>Docket No. 1-11-3400 |
| Filed | July 16, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Plaintiffs' registrations under the Title Insurance Act were properly permanently revoked by the Department of Financial and Professional Regulation based on evidence showing that each engaged in dishonest dealings in "mortgage rescue" loan transactions in which plaintiffs acted as title agent, including improper statements on loan applications, improper notarization of documents, and altered HUD-1 settlement statements. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CH-5525; the Hon. Carolyn Quinn, Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed. |
| Counsel on Appeal | Paul H. Strecker and Christy J. Jepson, both of Strecker, Jepson & Associates, of Lake Zurich, for appellants. |
| | Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Marcy C. Labrec, Assistant Attorney General, of counsel), for appellees. |
| Panel | JUSTICE SIMON delivered the judgment of the court, with opinion. |
| | Presiding Justice Harris and Justice Quinn concurred in the judgment and opinion. |

# OPINION

¶ 1    Plaintiffs, All American Title Agency, LLC (All American), and Title Zone, LLC (Title Zone), appeal from an order of the circuit court of Cook County affirming those portions of the final order of the Secretary of the Illinois Department of Financial and Professional Regulation (Department) permanently revoking plaintiffs' registrations under the Title Insurance Act (215 ILCS 155/1 *et seq.* (West 2004)). On appeal, plaintiffs contend that the Secretary and the circuit court erred by revoking their registrations and that their due process rights were violated in the administrative proceedings conducted by the Department. For the reasons that follow, we affirm.

¶ 2                                              BACKGROUND
¶ 3    In February 2006, SouthStar Funding (SouthStar) filed complaints against plaintiffs and five other title agencies, E.J.F. Title Agency, LLC, Palatine Title Agency, LLC, Popular Title Agency, LLC, Senior Title Agency, LLC, and Skyline Title Agency, LLC, regarding real estate transactions involving Charles White. The Department conducted an investigation of the title agencies and, on July 31, 2006, entered an order revoking the registrations of all seven agencies. The Secretary subsequently upheld the revocations of all seven title agencies; however, the circuit court reversed the revocations of five of the agencies and upheld the revocations of the registrations of plaintiffs, All American and Title Zone, on administrative review. As no appeal has been taken from that portion of the circuit court's order reversing the revocations of the registrations of the other five title agencies, our consideration is limited to the revocation of plaintiffs' registrations. See *Deutsche Bank National v. Burtley*, 371 Ill. App. 3d 1, 9 (2006) (the appellate court only has jurisdiction over those matters raised in the notice of appeal).

¶ 4    In its revocation order, the Department made a number of findings regarding "mortgage rescue" transactions that were engineered by White and for which All American acted as the title agent.[1] In such transactions, White would approach homeowners nearing foreclosure and propose an arrangement whereby they could remain in their property for a year while they restored their financial resources. White offered to locate an investor that would purchase the distressed property prior to foreclosure, lease the property to the homeowner for a year, and then resell the property back to the homeowner at the conclusion of that year. The Department found that several of the loan applications used in those transactions improperly stated that the investor intended to use the property as a primary residence and that several mortgage-related documents executed in those transactions were not properly notarized by the title agent. The Department also found that All American altered the HUD-1 settlement statements which had been approved by the lenders at the closings of some of the mortgage rescue transactions and redirected the proceeds from those sales to Eyes Have Not Seen, a property management company controlled by White.

¶ 5    In addition, the Department found that White maintained a financial interest in Title Zone because his grandmother owned a 30% interest in Title Zone and he was the executor of her estate and that All American owned the remaining 70% of Title Zone and shifted proceeds from the closings of the mortgage rescue transactions for which it had acted as the title agent to Title Zone. The Department further found that All American was the exclusive title agent for White's mortgage rescue transactions and that White and All American had violated the Real Estate Settlement Procedures Act of 1974 (12 U.S.C. § 2601 *et seq.* (2000)) and section 18 of the Title Insurance Act (215 ILCS 155/18 (West 2004)) by failing to disclose White's financial interest in Title Zone to the consumers with whom they were doing business.

¶ 6    On August 2, 2006, the banking division of the Department issued an emergency order suspending White's loan originator registration for violations of the Residential Mortgage License Act of 1987 (205 ILCS 635/1-1 *et seq.* (West 2004)) and its accompanying rules. The Department examined a number of loans originated by White as a loan originator for Mutual Trust Funding Corp., and found that White had engaged in dishonest dealings related to the disbursement of approximately $1.5 million in loan proceeds to Eyes Have Not Seen and failed to disclose his financial interests in Title Zone and Eyes Have Not Seen in furtherance of those dealings.

¶ 7    Plaintiffs appealed from the Department's order revoking their registrations and, at the hearing on that appeal, Phil Stein, a financial institutions examiner for the Department, testified that he had conducted an investigation of the agencies and he believed White had been involved in mortgage rescue transactions and owned 30% of Title Zone through a trust. Stein testified about the files of a number of real estate closings conducted by All American and the alleged discrepancies he discovered therein regarding the identity of the seller, the

_____

[1]The Illinois General Assembly has since enacted the Mortgage Rescue Fraud Act (765 ILCS 940/1 *et seq.* (West 2008)) to address such transactions, but that statute is not at issue in this case because plaintiffs' registrations were revoked under the Title Insurance Act and the Mortgage Rescue Fraud Act had not yet been enacted when the events giving rise to this case took place.

timing of certain disbursements, and incomplete occupancy statements and financial interest disclosures. Stein also testified regarding a number of closing files that each contained multiple HUD-1 settlement statements.

¶ 8      One of the files contained a copy of a check from All American to Eyes Have Not Seen for $138,945.40 and three HUD-1 settlement statements, each of which had a disbursement and settlement date of October 25, 2006, and indicated that $138,945.40 of the funds due to the seller would be used as a "payoff of first mortgage loan." The first settlement statement was stamped as "HUD approved," but was not signed by the buyer or the seller, and indicated that the seller was due $50,045.62 in cash. The second statement was signed by the buyer and the seller and indicated that $50,509.30 of the funds due to the seller would be used for "payment on account" and that the seller was not due any cash. The third statement was signed by the buyer and the seller, did not include a notation for "payment on account," and indicated that the seller was due $50,509.30 in cash. The file also contained a balance sheet from the transaction indicating that $49,095.62 was disbursed to Eyes Have Not Seen on October 26, 2005, and Stein testified that this disbursement was not accounted for in any of the settlement statements in the file.

¶ 9      A second file about which Stein testified contained two HUD-1 settlement statements with a settlement date of December 12, 2005. One statement was signed by the buyer and the seller and indicated that $125,058.87 of the funds due to the seller would be disbursed to Eyes Have Not Seen for "payment on account" and that the seller was not due any cash. The other statement was not signed by the buyer or the seller, indicated that the seller was due $137,187.45 in cash, and did not include a notation for "payment on account."

¶ 10      A third file about which Stein testified contained two HUD-1 settlement statements with a settlement date of December 8, 2005. One statement was signed by the buyer and the seller and indicated that $8,219.70 of the funds due to seller would be distributed to Eyes Have Not Seen for "payment on account" and that the seller was not due any cash. The other statement was not signed by the buyer or the seller, had a stamp of "HUD approved" which had been crossed out, did not include a notation for "payment on account," and indicated that the seller was due $58,480.70 in cash. The file also contained a receipt for a check from All American's escrow account to Eyes Have Not Seen for $48,219.70 for "payment on account" that was disbursed on December 9, 2005, and a disbursement ledger for the transaction which reflected payment having been made to Eyes Have Not Seen.

¶ 11      On cross-examination, Stein stated that the existence of multiple HUD-1 statements in a closing file does not alone establish that something was wrong with the underlying transaction and that Christy Jepson, an owner of All American, told him that White's grandmother owned a 30% interest of Title Zone and that White was the executor of her estate.

¶ 12      Harry Stirmell, the supervisor for the title insurance section of the Department, testified that he ordered the investigation of the title agencies in response to complaints submitted by mortgage lender SouthStar regarding disbursements to Eyes Have Not Seen that allegedly were not included in the HUD-1 statements reviewed and approved by SouthStar. Stirmell reviewed the files prepared by Stein and determined that the HUD-1 statements used at the

closings were different from those approved by the lender and that the money that was supposed to go to the seller was diverted to Eyes Have Not Seen.

¶ 13 Michael Hardecopf, the Illinois agency manager for Ticor Title Insurance Co. (Ticor), testified that plaintiffs had been agents of Ticor and that Title Zone had filed an application for agency with Ticor which indicated that Charles White was a manager and key decision maker of Title Zone and that All American owned a 70% interest in Title Zone and the estate of Elnora White owned the remaining 30%. Hardecopf reviewed All American's files after having received letters from SouthStar regarding real estate closings conducted by All American and involving White and having learned that plaintiffs were being investigated by the Department. Hardecopf discovered that several closing files contained multiple HUD-1 settlement statements, some of which were signed and some of which reflected payments to entities, including Eyes Have Not Seen, that were not parties to the relevant transactions. Based on his review of All American's files, Hardecopf determined that Ticor could no longer do business with plaintiffs, and Ticor cancelled its contracts with them.

¶ 14 Hardecopf further testified that it was Ticor's policy that, if a HUD-1 statement is revised during a closing after it has been approved by the lender, the lender must be provided with a copy of the revised HUD-1 statement. Hardecopf explained that the lender in a real estate transaction wants to know where the seller's money is going because it could affect the lender's determination of risk, particularly in situations where the seller's funds are being used to fund the borrower's down payment on the loan. On cross-examination, Hardecopf stated that it was not uncommon for multiple HUD-1 statements to be prepared during the course of a closing and that Ticor had not cancelled any contracts with title agencies solely on the basis that multiple HUD-1 statements were included in a closing file.

¶ 15 Reynold Benjamin, the assistant director of the banking division of the Department, testified that on February 2, 2007, the banking division entered an order revoking White's loan originator registration. The order issued following the banking division's investigation into the facts related to the prior emergency suspension of White's loan originator registration which led to the finding that White had violated the Residential Mortgage License Act of 1987 and its accompanying rules.

¶ 16 Plaintiffs then called Christy Jepson, Paul Strecker, Kristin Jepson, and Felicia Ford as witnesses. Christy Jepson testified that All American was audited by Ticor in June 2006 and received a high grade in the report prepared from that audit. Strecker testified that he closed real estate transactions and provided attorney services for All American and that it was nearly impossible to conduct a real estate closing without generating multiple HUD-1 statements during the course of the closing. Strecker also testified that White was in charge of marketing at Title Zone beginning in August 2005 and that White was never a manager of Title Zone and was not listed as a manager on its operating agreement.

¶ 17 Kristin Jepson testified that she was a manager at All American from August 2003 to July 2006, during which time Ticor never indicated that it had a policy prohibiting the disbursement of funds from a real estate transaction to third parties, that while she was a manager, All American did title work for White and performed 20 or more closings per month for him and that, to the best of her knowledge, White did not have an ownership

interest in Title Zone.

¶ 18    Ford testified that she had performed closings for All American and Title Zone and that changes were often made to the HUD-1 statements during the course of a closing. Ford also testified that she sometimes disbursed funds from the real estate transaction to third parties at the request of the buyer or the seller and that all title agencies accommodated buyers and sellers in that manner. On cross-examination, Ford stated that the closer could disburse money from a real estate transaction to a third party without the lender's permission even if such a disbursement was not provided for in the final HUD-1 statement.

¶ 19    At the conclusion of the hearing, the hearing officer made a number of findings of fact, conclusions of law, and recommendations to the Secretary. Regarding Title Zone, the hearing officer found that White was employed by Title Zone as its marketing director, his grandmother owned 30% of Title Zone, and his license was revoked by the Department's division of banking for engaging in dishonest dealings related to the disbursement of approximately $1.5 million in loan proceeds to Eyes Have Not Seen. The hearing officer concluded that Title Zone showed poor judgment and demonstrated "unworthiness or incompetency in transacting the business of guaranteeing titles to real estate in such a manner as to endanger the public" by employing White and allowing him a possible ownership interest in the agency through his grandmother's estate thereby violating the Title Insurance Act. The hearing officer recommended that Title Zone's registration be permanently revoked because White's loan originator license had been revoked and the same discipline should be employed against the title agency which employed White and allowed him a potential ownership interest.

¶ 20    Regarding All American, the hearing officer found that All American received about 20 closing referrals per month from White for a sustained period of time and conducted a number of closings at which multiple HUD-1 statements were generated and a final statement showing all disbursements was not delivered to all parties in a timely manner. The hearing officer also found that All American's failure to disseminate timely and accurate closing information "can endanger the public by making it easier for unscrupulous operators to complete questionable or fraudulent real estate transactions" and concluded that All American violated the Title Insurance Act. The hearing officer, however, recommended that the prior revocation order against All American be terminated because its violations were more in the nature of negligence or recklessness than intentional criminal wrongdoing and it had been sufficiently punished by the prior revocation order, which had been in effect for 15 months.

¶ 21    On January 10, 2008, the Secretary entered a final order affirming the July 31, 2006, order of the Department revoking plaintiffs' registrations. In doing so, the Secretary adopted most of the hearing officer's findings, conclusions, and recommendations, but rejected the hearing officer's recommendation to terminate the revocation of All American's registration, finding that the Title Insurance Act does not differentiate between acts of negligence or recklessness and acts of intentional criminal wrongdoing.

¶ 22    On February 13, 2008, plaintiffs filed a complaint for administrative review in the circuit court of Cook County alleging that the Secretary's final order was against the manifest

weight of the evidence and that the Department failed to comply with relevant discovery requirements during the course of the administrative proceedings. On October 17, 2011, the court affirmed the revocation of plaintiffs' registrations, finding that the record contained "competent evidence that All American performed closings for White and, at a minimum, was guilty of incompetence in failing to identify the irregularities in the transactions including White's disbursement of proceeds to his own company." While the court found that the evidence did not show that White had an ownership interest in Title Zone, it determined that Title Zone's employment of White supported a finding of untrustworthiness and incompetence.

¶ 23                                          ANALYSIS

¶ 24                                    I. Title Insurance Act

¶ 25    On appeal, plaintiffs challenge the Secretary's order revoking their registrations. While plaintiffs also challenge the circuit court's order, this court reviews the final decision of the administrative agency, and not that of the circuit court. *Kafin v. Division of Professional Regulation of the Department of Financial & Professional Regulation*, 2012 IL App (1st) 111875, ¶ 31. As such, our review is limited to the Secretary's order and the hearing officer's findings of fact and conclusions of law to the extent they were adopted by the Secretary.

¶ 26    The Secretary may revoke any registration issued pursuant to the Title Insurance Act if the Secretary determines that the holder of the registration "has demonstrated untrustworthiness or incompetency in transacting the business of guaranteeing titles to real estate in such a manner as to endanger the public." 215 ILCS 155/21(a)(3) (West 2004). The standard of review to apply on review of an administrative agency decision depends on whether the question presented is one of fact, one of law, or a mixed question of fact and law. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008). In this case, plaintiffs are challenging the Secretary's determination that the evidence presented at the administrative hearing established that plaintiffs engaged in conduct constituting violations of the Title Insurance Act. The issues before this court, therefore, require an examination of the legal effect of a given set of facts and present mixed questions of fact and law. As such, we will review the Secretary's decision under a clearly erroneous standard of review. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998). A decision will be deemed clearly erroneous when the reviewing court is left with the definite and firm conviction that a mistake has been made. *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 395 (2001).

¶ 27                                      A. Title Zone

¶ 28    The Secretary based his revocation of Title Zone's registration on the conclusion that Title Zone had violated the Title Insurance Act because it showed poor judgment by employing White and allowing him a possible ownership interest through his grandmother. The record shows that White's loan originator license was suspended and then revoked for having engaged in dishonest dealings related to the disbursement of approximately $1.5 million in loan proceeds to Eyes Have Not Seen. In addition, White was subsequently

convicted of a number of crimes in federal court on evidence showing that he was responsible for fraudulently procuring mortgage financing for investors of Eyes Have Not Seen. See *United States v. Helton*, No. 06-CR-763, 2011 WL 2680468, at *8 (N.D. Ill. July 8, 2011); see also *Metropolitan Life Insurance Co. v. American National Bank & Trust Co.*, 288 Ill. App. 3d 760, 764 (1997) ("This court may take judicial notice of public documents that are included in the records of other courts.").

¶ 29       The record also shows that Strecker testified that beginning in 2005 White was in charge of marketing at Title Zone and, while Strecker also testified that White was never a manager of Title Zone, that testimony was contradicted by the application for agency Title Zone filed with Ticor, which indicated that White was a manager and key decision maker of Title Zone. Christy Jepson stated during oral arguments that Title Zone was partially owned by a mortgage company, which derived a percentage of the profits made by Title Zone based on its ownership interest, and admitted that while White's grandmother, Elnora White, purportedly owned 30% of Title Zone based on her investment of $300, that interest was actually owned by a mortgage company owned by Charles White, presumably Mutual Trust Funding Corp.

¶ 30       The record, therefore, shows that White engaged in dishonest dealings in relation to the disbursement of loan proceeds to Eyes Have Not Seen, was a manager and key decision maker of Title Zone, and had an effective ownership interest in Title Zone through his mortgage company. As such, the Secretary's conclusion that Title Zone violated the Title Insurance Act by employing White and allowing him an ostensible ownership interest in Title Zone while he was engaged in dishonest dealings in relation to Eyes Have Not Seen is not clearly erroneous.

¶ 31                                      B. All American

¶ 32       The Secretary's revocation of All American's registration was based on the conclusion that All American had violated the Title Insurance Act because it conducted a number of closings at which multiple HUD-1 statements were generated and failed to provide the parties with a final statement showing all disbursements in a timely manner. Plaintiffs assert that All American did not violate the Title Insurance Act because neither the existence of multiple HUD-1 statements nor the disbursement of funds to a third party at the seller's discretion was contrary to industry practices or violated any lender's instructions or underwriting standards. Defendants respond that the last-minute changes and delayed disclosure of payments to Eyes Have Not Seen reflect an intent by All American to hide these disbursements by disclosing them during the closing, at which time the buyer and seller are often pressed for time and the lender is under pressure to approve the transaction.

¶ 33       The record shows that All American conducted at least three closings at which multiple HUD-1 statements were generated and only the final statement disclosed that all of the funds due to the seller would be distributed to Eyes Have Not Seen. In addition, Kristin Jepson testified that All American performed 20 or more closings per month for White and Christy Jepson stated during oral argument that he knew White owned Eyes Have Not Seen. Further, All American owned a 70% interest in Title Zone and, as stated earlier, White was a

manager, key decision maker, and effectively a partial owner of Title Zone.

¶ 34　　The record, therefore, shows that in a number of closings conducted by All American, the seller's entire equity in the property was transferred to Eyes Have Not Seen, an entity believed to be owned by White, a manager and ostensible partial owner of Title Zone, and that the disbursement of funds to Eyes Have Not Seen was not disclosed to the other parties, including the lender, until it was included in the final HUD-1 statement. As White engineered mortgage rescue transactions and must have reached an agreement with the seller regarding the transfer of the seller's funds to Eyes Have Not Seen prior to conducting such a transaction and All American performed at least 20 closings a month for White, the Secretary could have formed a reasonable conclusion that All American must have known from the start of the closing that the seller's funds would be transferred to Eyes Have Not Seen and then failed to disclose that disbursement until the final HUD-1 statement. In addition, the Secretary could have reasoned that, even if All American did not have prior knowledge of the transfer of funds to Eyes Have Not Seen, it should have noticed the disbursement of all the sellers' funds to Eyes Have Not Seen and determined that by turning a blind eye to this conduct, All American made it easier for unscrupulous operators, such as White, to complete questionable and/or fraudulent mortgage rescue transactions. As such, the Secretary's determination that All American violated the Title Insurance Act by failing to disclose the disbursement of funds to Eyes Have Not Seen in a timely manner is not clearly erroneous.

¶ 35　　　　　　　　　　　　　　II. Due Process

¶ 36　　Plaintiffs contend that they were denied due process because the Department improperly withheld a memorandum prepared by Stein and failed to tender that document to plaintiffs prior to the administrative hearing. Due process requires that an administrative hearing include the opportunity to be heard, the right to cross-examine adverse witnesses, and impartiality in ruling upon the evidence (*Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 95 (1992)), and a party claiming that a due process violation has occurred must establish that it was prejudiced by the alleged violation (*Gonzalez v. Pollution Control Board*, 2011 IL App (1st) 093021, ¶ 42).

¶ 37　　During the cross-examination of Stein, plaintiffs' counsel argued that the Department had violated discovery rules by failing to tender a memorandum prepared by Stein during the investigation of the title agencies and requested that Stein's testimony be stricken and the Department be barred from calling him as a witness. The hearing officer directed the Department to provide plaintiffs with the memorandum and granted plaintiffs leave to recall Stein as a witness if they wished to do so after having reviewed the document. Plaintiffs later requested that, as a sanction for the alleged discovery violation, the revocation proceedings against them be dismissed. The hearing officer denied the request, finding that any prejudice suffered by plaintiffs as a result of the Department's failure to disclose the memorandum was cured when the Department provided plaintiffs with the memorandum and plaintiffs were granted leave to recall Stein as a witness if they chose to do so. Although plaintiffs assert that the result of the administrative proceedings might have been different had the memorandum

been disclosed prior to the start of the hearing, plaintiffs do not attempt to explain why the result would have been different and have not included the memorandum in the appellate record. As such, we agree with the hearing officer that any prejudice plaintiffs may have suffered as a result of the Department's failure to tender Stein's memorandum prior to the hearing was cured at the hearing and determine that plaintiffs have not established that their due process rights were violated by the Department's alleged discovery violation.

¶ 38     Plaintiffs also contend that they were denied due process because the Department failed to conduct a prompt hearing on their challenge to the initial revocation order. In his report to the Secretary, the hearing officer pointed out that plaintiffs had conducted extensive written and oral discovery prior to the hearing and that any delays between the entry of the initial revocation order and the hearing on plaintiffs' appeal of that order were either caused by or consented to by plaintiffs. As any delay was either attributable to or consented to by plaintiffs, we determine that plaintiffs have not demonstrated that their due process rights have been violated by any delay in conducting a hearing on their appeal of the revocation order. *Gunia v. Cook County Sheriff's Merit Board*, 211 Ill. App. 3d 761, 769 (1991).


¶ 39                                    CONCLUSION
¶ 40     Accordingly, we affirm the judgment of the circuit court of Cook County.


¶ 41     Affirmed.