2015 IL App (1st) 142999

THIRD DIVISION
September 23, 2015

No. 1-14-2999

| | | |
|---|---|---|
| WINDSOR CLOTHING STORE, | ) | Petition for Review of |
| | ) | an Order of the Illinois |
| Petitioner, | ) | Human Rights Commission |
| | ) | |
| v. | ) | Charge No. 08-CP-2590 |
| | ) | ALS No. 08-0551 |
| MARTIN R. CASTRO, Chairman, Illinois Human | ) | |
| Rights Commission; ROCCO J. CLAPS, Director of | ) | |
| Human Rights, Department of Human Rights; LON | ) | |
| MELTESEN, Chief Legal Counsel, Department of | ) | |
| Human Rights; and KATRINA MILES, | ) | |
| | ) | |
| Respondents. | ) | |

PRESIDING JUSTICE MASON delivered the judgment of the court, with opinion.
Justices Hyman and Pucinski concurred in the judgment and opinion.

**OPINION**

¶ 1    Respondent Katrina Miles filed a complaint with the Illinois Department of Human Rights (Department) against petitioner Windsor Clothing Store (Windsor), alleging a denial of the full and equal enjoyment of a public accommodation based on race, in violation of section 5-102(A) of the Illinois Human Rights Act (Act) (775 ILCS 5/5-102(A) (West 2012)). Windsor did not submit a verified response to the charge and the Illinois Human Rights Commission (Commission) entered a default order against Windsor. Windsor's untimely motion to vacate the default order was denied for lack of jurisdiction and, following a damages hearing, the administrative law judge (ALJ) entered a recommended order and decision (ROD) awarding Miles $25,000 in compensation for emotional distress. The Commission adopted the ROD as its final administrative decision.

¶ 2        On appeal, Windsor contends that (1) the entry of the default order was improper because the Department failed to show that Windsor demonstrated a contumacious disregard for the Department's authority, (2) the Commission's finding that Miles suffered emotional distress is against the manifest weight of the evidence, and (3) the award of $25,000 is excessive and unsubstantiated.  Finding no merit to Windsor's arguments, we confirm the Commission's decision.

¶ 3                                     BACKGROUND

¶ 4        On September 10, 2007, Miles filed a discrimination complaint with the Department. The complaint alleged that on September 4, 2007, Miles visited the Windsor clothing store in Chicago Ridge, Illinois.  Miles, who identified her race as black, was followed by a sales associate the entire time she was in the store.  No reason was given for this treatment, and non-black customers were not treated in the same manner.

¶ 5        On April 3, 2008, the Department mailed a notice of the charge to Windsor's Chicago Ridge address.  Windsor was informed that it was required to file a verified response to the allegations within 60 days of receiving the charge and, if it failed to do so, the Department would issue a notice of default.  Based on regulations that presume receipt five days after mailing, the Department calculated that Windsor's verified response was due June 9, 2008. The mailing also included a questionnaire requesting additional data that Windsor was to provide to the Department to supplement its verified response.

¶ 6        Antoinette Burch, an assistant human resources manager located in Vernon, California, responded to the questionnaire on April 25, 2008.  Robert Sliter, Vice President of Operations, also out of Vernon, California, was listed as another person from whom information relating to the charge could be obtained.  An "incident recap" prepared by Mayra

Zuniga, the Chicago Ridge store manager, was purportedly attached to the questionnaire response, but this attachment does not appear in the record. Zuniga, Kelly Meyer (the district manager), and two sales associates were listed as witnesses to the incident.

¶ 7    On July 7, 2008, a Department representative spoke to Burch by telephone and reminded her that Windsor had not yet provided the verified response that was due on June 9. In response, Burch again faxed a copy of the questionnaire response she sent on April 25. On July 8, Burch was again advised that the fax she sent on July 7 was not a verified response. The Department mailed a letter to Burch's attention that same day, stating the verified response to the charge was overdue and advising Windsor that if the response was not received by July 15, a notice to show cause would be issued and default procedures could be initiated. The Department included a sample of a verified response to assist Windsor in making sure all necessary elements were included in its response.

¶ 8    Because Windsor did not submit a verified response by July 15, the Department mailed Windsor a notice to show cause on July 22, 2008. Windsor was given 15 days to respond and was instructed to show cause why a notice of default should not issue. If Windsor did not comply, a notice of default would be issued.

¶ 9    Windsor did not submit a verified response, nor did it show cause why a notice of default should not issue. On September 10, 2008, the Department mailed Windsor a notice of default for failure to file a timely verified response. The notice informed Windsor that it could seek review of the default by October 15, 2008, and a form for requesting review was included with the notice. Windsor did not request review of the notice of default.

¶ 10    On December 8, 2008, the Department entered a default order against Windsor because it failed to file a verified response, did not show good cause for that failure, and did not timely

file a request for review of the notice of default. On December 18, 2008, the Department filed a petition for a hearing to determine damages with the Commission. The Commission entered an order on January 28, 2009, granting the petition. The Commission noted that it did not have the authority to review the propriety of the default entered by the Department, and the matter was referred for a hearing on damages.

¶ 11    The hearing was scheduled for June 9, 2009. Windsor filed an emergency motion to vacate the default on June 2, 2009. Windsor argued that nobody but Burch was aware that Miles had filed a charge against Windsor, and explained that Burch went on maternity leave on December 12, 2008, and was later terminated for performance reasons. Windsor further claimed that it did not become aware of the charge until it received correspondence from the Department in April 2009 that was not addressed to Burch. The ALJ assigned to the case denied the motion on June 8, 2009, on the grounds that she lacked the authority to vacate the default, and the hearing proceeded as scheduled.

¶ 12    Miles testified that she was a regular customer of Windsor's Chicago Ridge store. On September 4, 2007, she was the only African-American customer in the store. Karolina,[1] a Windsor employee, followed Miles from one end of the store to the other during the 30 minutes she was shopping. Miles noticed that as she moved around the store, Karolina was never more than a few feet away from her. Karolina never asked Miles if she needed assistance. Miles began to feel uncomfortable and started looking around the store. She observed several white teenagers in the fitting room, making noise and slamming doors, but no store employee went to that area.

_____

[1]    Although the record also contains the spelling "Carolina," the answers Windsor provided to the Department's questionnaire spell the sales associate's name with a "K."

- 4 -

¶ 13     Miles went to the checkout counter and asked to speak to the store manager. After Miles told the manager about Karolina's conduct, the manager apologized and said that she would inform the district manager of the incident. The store manager asked Karolina for an explanation and Karolina's only response was, "I'm sorry." Mall security was also called and Miles made a complaint.

¶ 14     Miles cried all the way home and was "totally distraught" when she called her fiancé to tell him what happened. Since the day of the incident, if Miles notices that she is the only black person in a store, she constantly looks over her shoulder to see if anyone is following her. She has also, at times, become very standoffish and defensive when sales associates ask her if she needs help, questioning why they are asking and whether they also offered to assist other customers.

¶ 15     Miles has experienced difficulty sleeping since the incident and will sometimes wake up in the middle of the night and cry for no reason. Right after it happened, she experienced headaches intermittently. Prior to the hearing, Miles had not seen a doctor and had not been prescribed any medication. She also did not seek professional counseling. Her fiancé was unable to attend the hearing because he had a conflicting court appearance regarding the guardianship of his mother's estate.

¶ 16     The store manager did not assure Miles that Windsor would take steps to prevent similar incidents from occurring in the future to other customers. Almost a week after the incident, Miles received a brief telephone call from Meyer, the district manager, who advised her that "the situation had been taken care of." Miles did not remember whether Meyer offered her a personal shopping experience, but she did not accept anything from Windsor and has not returned to the Chicago Ridge store or visited any other Windsor location. Miles did not have any other witnesses.

¶ 17    Meyer, the district manager, was the only witness called on Windsor's behalf. Meyer testified that she received a voice mail message from the store manager informing her of the incident on the day it occurred. Meyer had been traveling that day and did not retrieve the message until close to midnight. The following day, Meyer was in a meeting all day and, because of the time difference, did not contact Miles after the meeting because it would have been after 6 p.m. Meyer then traveled again the next day, so was unable to contact Miles until the following Monday.

¶ 18    Meyer asked Miles to explain the incident from her perspective. Miles seemed "very disturbed by the situation and, obviously, unhappy with what had occurred in the store." Meyer apologized to Miles, but confirmed that her apology was in the context of Miles having a mistaken perception of what had occurred. According to the report Meyer received, the store manager and Karolina were taking turns out on the floor and back with the customers in the fitting room.

¶ 19    Meyer offered Miles a personal shopping experience with a store manager at another location, but Miles declined. Meyer asked how Windsor could rectify the situation and Miles responded that she did not want a similar incident to occur with anyone else. Meyer said, "Okay," and the conversation ended.

¶ 20    In her closing remarks, Miles stated that the customers who were in the fitting room while she was in the store were not attended to at any time by either Karolina or the store manager, Karolina was the only associate on the floor, and the store manager was either by the register or in the stockroom. Miles further stated that she felt she had been racially profiled at Windsor and that profiling inside stores is now a constant fear for her. Miles did not request a specific amount in damages for the emotional distress caused by the incident.

¶ 21 In the ROD issued on August 19, 2013, the ALJ recommended an award of $25,000 to Miles for emotional damages suffered as a result of Windsor's actions. In her findings of fact, the ALJ noted that Windsor is a clothing store and that Miles claimed denial of full and equal enjoyment of a public facility. In her conclusions of law, the ALJ mistakenly characterized Windsor as an "employer," but also found that Windsor's actions constituted a denial of full and equal enjoyment of a public facility.

¶ 22 In her discussion, the ALJ noted that Miles had not specified an amount she was seeking as compensation for emotional distress. The ALJ concluded that the degree of emotional distress was significantly over and above that which would be expected from "the mere fact of a civil rights violation," as evidenced by Miles' continued lack of sleep, crying and discomfort in places where she is the only African-American. The ALJ further noted that Miles' emotional distress was compounded by Windsor's "failure to respond to her concern in an appropriate manner by acknowledging that there was a problem with the activities of [K]arolina."

¶ 23 Windsor filed exceptions to the ROD, arguing that (1) the ALJ wrongfully concluded that it was an employer under the Act, (2) Miles was not entitled to emotional distress damages, and (3) the ALJ failed to substantiate the emotional distress damage award and the award was excessive. After consideration of both the ROD and Windsor's exceptions, the Commission entered an order on January 20, 2014, declining further review and adopting the ROD as its final order.

¶ 24 Windsor filed a petition for rehearing before the full Commission on the grounds that an award of $25,000 was excessive. On August 2, 2014, the Commission denied the petition, finding that it did not either clearly raise legal issues of significant impact or demonstrate that panels of the Commission have reached conflicting decisions. Windsor received a copy of

the order on August 28, 2014, and timely filed a petition for review with this court, pursuant to section 111(B) of the Act (775 ILCS 5/8-111(B) (West 2012)) (A party may obtain judicial review of a final order of the Commission "by filing a petition for review in the Appellate Court within 35 days from the date that a copy of the decision sought to be reviewed was served upon the party affected by the decision.").

¶ 25                                ANALYSIS

¶ 26        The Commission's findings of fact will be sustained unless the court concludes they are against the manifest weight of the evidence. *Raintree Health Care Center v. Illinois Human Rights Comm'n*, 173 Ill. 2d 469, 479 (1996). An agency's finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992).

¶ 27        Windsor first contends that the entry of the default order was improper because the Department failed to show that Windsor demonstrated a contumacious disregard for the Department's authority. Windsor acknowledges that the Commission did not have jurisdiction to review the default order issued by the Department, but argues that the default order can be reviewed by this court. We agree.

¶ 28        As an administrative agency, the Department's only powers are those granted to it by the legislature, and any action it takes must be specifically authorized by statute. *Vuagniaux v. Department of Professional Regulation*, 208 Ill. 2d 173, 186 (2003). Under the Act, once a complainant has filed a charge alleging a civil rights violation with the Department, the respondent is required to file a verified response within 60 days of receipt of notice of the charge. 775 ILCS 5/7A-102(B) (West 2012). The Department may then issue a notice of

default to any respondent who fails to file a timely verified response unless the respondent can demonstrate good cause why the default should not issue. *Id.*

¶ 29    The term "good cause" is defined by Department rules. *Id.* Section 2520.405 of the Illinois Administrative Code provides a non-exhaustive list of situations that may constitute good cause. 56 Ill. Adm. Code 2520.405(c) (2006). These situations include death or sudden serious illness of the respondent's representative or an immediate family member, circumstances beyond the respondent's control, and a later determination by the Department that a timely filed verified response was defective. 56 Ill. Adm. Code 2520.405(c)(1)-(3), (5) (2006). Finally, good cause may be found where "[r]espondent acted with due diligence and was not deliberate or contumacious and did not unwarrantedly disregard the verified response process, as supported by affidavit or other evidence." 56 Ill. Admin. Code § 2520.405(c)(4) (2006). "Whether good cause exists is in the sole discretion of the Department." 56 Ill. Adm. Code 2520.405(d) (2006).

¶ 30    On appeal, Windsor acknowledges that Burch received a request for a verified response from the Department on July 8, 2008, and that she failed to provide that response. Windsor states, "[t]hereafter, Burch went on maternity leave and ended her employment at Windsor."

¶ 31    Windsor argues that it acted with diligence because it responded to phone inquiries and provided a response to the Department's questionnaire. Windsor further contends, "[e]ven if Windsor is found to be negligent for its failure to have a mechanism in place for transitioning matters of this nature from a departing employee to another, negligence is insufficient to support the drastic sanction of default."

¶ 32    The record establishes that the original notice of the charge filed by Miles was sent to Windsor's Chicago Ridge location on April 3. Following a response to that notice from

Burch in California on April 25, the Department directed all future communications to Burch. But Burch did not submit a verified response to Miles' complaint; she only provided answers to the questionnaire sent by the Department. Those answers included the name of another person in the California office who was aware of the charge, and an incident report prepared by the manager of the Chicago Ridge store in response to the charge.

¶ 33    In July, after the 60-day deadline for filing a verified response had passed, the Department again contacted Burch and gave her another opportunity to provide a verified response. When Burch merely provided the same answers to the questionnaire she sent in April, the Department advised her on July 8 that the April 25 fax was not a verified response, provided a sample of a verified response for her to use as a guide, and informed her that if a verified response was not submitted by July 15, a notice to show cause would be issued.

¶ 34    Under Windsor's limited recitation of the facts, it would appear that Burch went on maternity leave and left the company shortly after this communication. In fact, Burch did not leave the company until December and continued to receive notices from the Department in the ensuing months. The Department sent Burch a notice to show cause on July 22, informing Windsor that if it did not provide a verified response within 15 days or explain why it was unable to do so, a notice of default would be issued. A notice of default was issued on September 10, and Windsor was informed that it could seek review by October 15. The order of default was entered on December 8, and Burch went on maternity leave December 12.

¶ 35    Windsor's arguments that it acted with diligence fail to take into account the repeated extensions given by the Department and the fact that Burch did not leave the company for 5 months after the July communication that Windsor acknowledges. The Department first provided an extension of time for Windsor to file a verified response beyond the 60 days and

took the additional step of providing a sample response for Burch to use as a guide. The Department did not actually issue a notice of default until September 10, although the notice to show cause sent on July 22 informed Windsor it had only 15 days to respond before a notice of default would issue. Finally, the Department informed Windsor the deadline for seeking review of the notice of default was October 15, but did not issue the default order until December 8.

¶ 36     Despite these numerous formal and informal extensions, Windsor failed to file a verified response, failed to show cause why it could not file such a response, and failed to file a request for a review of the default order. This cannot be characterized as simply a matter of failing to transition matters properly after an employee left the company, when that employee received multiple notices from the Department in the 5 months before she left the company and was granted multiple extensions but failed to take any action.

¶ 37     We reject Windsor's contention that its representatives "committed error in that they were confused about the Department's requirements for an Answer to the Questionnaire and also a Verified Response." The Department promptly notified Burch that her answers to the questionnaire did not constitute a verified response and provided a sample of a verified response for her to use as a guide. We further reject Windsor's argument that it never received the notice to show cause or the default order. Windsor does not deny that Burch received the notification in July that the Department had not received Windsor's verified response, or that it received notice of the hearing on damages almost a year later. There is nothing in the record to support Windsor's contention that it did not receive the many communications sent by the Department between the notice Burch initially responded to in July 2008 and the notice of the hearing on damages which Windsor responded to in June

2009. The repeated failure of Windsor's agent to properly respond to the many communications from the Department does not constitute good cause.

¶ 38    Moreover, Burch left Windsor four days after the default order was entered and mailed to Windsor but apparently Windsor made no effort to determine whether anything Burch had been working on needed immediate attention after her departure. The Department also mailed a notice of an upcoming status hearing to Burch on February 10, 2009, after Burch had left Windsor. Yet Windsor did not respond until a hearing on damages was scheduled for June 9, when it filed an emergency motion on June 2 and claimed that nobody at Windsor but Burch was aware that a charge had been filed. Certainly if, as Windsor represented, Burch was terminated for "performance based reasons," it would stand to reason that Windsor would make some effort after her departure to monitor matters for which she had been responsible. Under these facts, contrary to Windsor's assertions, it has not demonstrated that it acted with diligence.

¶ 39    Although the Commission no longer had jurisdiction to vacate the default order by the time Windsor finally challenged that order and, therefore, did not make any determination regarding whether Windsor had demonstrated good cause, the Department argues on appeal that Windsor has not, in fact, shown good cause. The record supports this argument and we decline to vacate the default order on appeal.

¶ 40    Windsor's reliance on *Chicago Transit Authority v. Department of Human Rights*, 169 Ill. App. 3d 749 (1988) is misplaced. Indeed, this court held in *Chicago Transit Authority* that the failure to either present witnesses after being given several opportunities to do so or submit good reason for the absence of such witnesses constituted a deliberate and contumacious disregard for the Department's authority and the order of default was therefore justified. *Id*. at 755.

¶ 41     Here, Windsor was given multiple opportunities to submit a verified response, even past the 60-day deadline, and provided with a sample to use as a guide.  It was then given extended opportunities to either avoid or challenge the default order.  Windsor's failure to (1) provide a verified response, (2) show cause why it could not provide such a response, and (3) file a timely request for review of the default order constitutes a deliberate and contumacious disregard for the Department's authority and the default order was justified.

¶ 42     Windsor next contends that Miles is not entitled to emotional distress damages, and further argues that, in the event this court determines such damages are appropriate, an award of $25,000 is excessive.  Windsor first argues that the evidence at the hearing does not support the ALJ's finding that Miles is entitled to emotional distress damages.  We disagree.

¶ 43     The ALJ found that since the incident, Miles is very conscious in situations where she is the only African-American in a public place and looks around to see if anyone is following her.  Miles is also very standoffish and defensive because of the incident.  Miles cried on the way home, has experienced difficulty sleeping, and still cries about the incident.  The ALJ further noted that Windsor failed to rebut any of Miles' testimony regarding her emotional distress.  Finally, the ALJ concluded that Miles' emotional distress was compounded by Windsor's failure to respond to her concern in an appropriate manner by acknowledging that there was a problem with the activities of Karolina and not just a "misunderstanding" on Miles' part.

¶ 44     As previously noted, this court will uphold the Commission's findings of fact unless they are against the manifest weight of the evidence.  Here, the Commission adopted the ALJ's recommendations, which are supported by the record.  The ALJ further found Miles to be a credible witness and we will not second guess that determination.

¶ 45        In contrast, not only did Windsor not provide any evidence to rebut Miles' testimony, but Meyer's testimony also indicates Windsor does not even acknowledge that Miles suffered any discrimination, despite the fact that when asked by her manager for an explanation, Karolina merely apologized. Meyer stated that Miles had a mistaken perception regarding the incident and claimed that the store manager and Karolina had been taking turns out on the floor and back in the fitting room with other customers. The ALJ did not find this testimony credible and noted that Miles' emotional distress was compounded by Windsor's refusal to acknowledge a problem with its employee's actions.

¶ 46        Determinations regarding the credibility of witnesses and the weight to be afforded their testimony are the province of the agency and this court will not substitute its judgment on those issues. *Koulegeorge v. Human Rights Comm'n*, 316 Ill. App. 3d 1079, 1087 (2000). We cannot say that the Commission's findings of fact are contrary to the manifest weight of the evidence and, therefore, conclude that the evidence presented at the hearing supports the Commission's determination that Miles is entitled to emotional distress damages.

¶ 47        Windsor next argues that the Commission's award of $25,000 was excessive. Although Windsor cites several Commission orders in which lesser amounts were awarded for emotional distress, "courts in Illinois have traditionally declined to compare damages awarded in one case to damages awarded in other cases in determining whether a particular award is excessive." *Drakeford v. University of Chicago Hospitals*, 2013 IL App (1st) 111366, ¶ 62.

¶ 48        The amount of damages awarded to a prevailing claimant by the Commission will not be disturbed on review absent an abuse of discretion. *City of Chicago v. Human Rights Comm'n*, 264 Ill. App. 3d 982, 987 (1994). Under this standard, the Commission's award will not be disturbed unless it is arbitrary or capricious, or unless no reasonable person would

agree with the Commission's position. *Young v. Illinois Human Rights Comm'n*, 2012 IL App (1st) 112204, ¶ 33. A decision is arbitrary and capricious if it contravenes legislative intent, fails to consider a critical aspect of the matter, or offers an explanation so implausible it cannot be considered an exercise of the agency's expertise. *Id.* In determining whether there has been an abuse of discretion, this court may not substitute its judgment for that of the agency, or even determine whether the agency exercised its discretion wisely. *Simmons v. Garces*, 198 Ill. 2d 541, 568 (2002).

¶ 49 The Act seeks to promote Illinois's public policy of securing for all individuals within Illinois freedom from discrimination on the basis of race in places of public accommodation. 775 ILCS 5/1-102(A) (West 2012). To that end, the Act prohibits the denial of full and equal enjoyment of the facilities, goods, and services of any place of public accommodation. *Id.* The Act authorizes the Commission to award damages for any injury or loss suffered (775 ILCS 5/8A-104(B) (West 2012)), and such damages include damages for emotional harm and mental suffering (*Szkoda v. Human Rights Comm'n*, 302 Ill. App. 3d 532, 545 (1998)).

¶ 50 The ALJ found that Miles suffered emotional distress and that distress was compounded by Windsor's failure to acknowledge its sales associate's discriminatory conduct. The Commission adopted those findings and the recommended award of $25,000 in damages. We cannot say that an award of this amount contravenes legislative intent, fails to consider a critical matter, or is outside the agency's expertise. Thus, we will not disturb the Commission's emotional damages award.

¶ 51 Finally, we briefly address Windsor's argument that reversal is warranted because the ALJ stated in her conclusions of law that Windsor is an employer for purposes of the Act. This argument has no merit. The ALJ's conclusions of law also state that Windsor is liable for violations of the Act that prohibit denial of full and equal enjoyment of a public facility,

and the fact and discussion sections make it clear that the ALJ was not treating this as an employment discrimination claim. Thus, the scrivenor's error in characterizing Windsor as an employer in one paragraph of the ROD rather than as a place of public accommodation does not warrant setting aside the Commission's decision.

¶ 52        Confirmed.