4030136.dlm.wpd

NO. 4-03-0136

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

CONSTRUX OF ILLINOIS, INC., an Illinois Corporation,

Plaintiff-Appellee,

v.

BETTE KAISERMAN, Individually, as Successor Trustee of the Louis Kaiserman Trust and as Trustee as to an Undivided 1/3 Interest in Parcel I by Reason of Her Being Grantee in Warranty Deed Recorded as Document No. 89H030864; DONALD L. KAISERMAN; HERBERT A. KAISERMAN, Individually and in His Capacity as Grantee in Warranty Deed Recorded as Document No. 91019189 as to Parcel I; UNKNOWN TRUSTEE OR SUCCESSOR TRUSTEE OF THE RESIDUARY TRUST as Created by Item Fourth of the Last Will and Testament of MORRIS KAISERMAN, Deceased; JOHN H. SHIPLEY; GENERAL ELECTRIC CAPITAL CORPORATION; UNITED STATES OF AMERICA; ROCHESTER STATE BANK; BANK ONE, SPRINGFIELD, f/k/a Springfield Marine Bank and Marine Bank of Springfield, as Successor Trustee as Noted in Item "Second," Paragraph (C), of the First Codicil as to the Last Will and Testament of MORRIS KAISERMAN, Deceased; and UNKNOWN OWNERS AND NONRECORD CLAIMANTS,

Defendants-Appellants.

)

)

)

)

)

)

)

)

))))))))))))))))))))))))

Appeal from

Circuit Court of

Sangamon County

No. 99CH514

Honorable

Leslie J. Graves,

Judge Presiding.

_________________________________________________________________

JUSTICE STEIGMANN delivered the opinion of the court:

In December 1999, plaintiff, Construx of Illinois, Inc. (Construx), sought to foreclose and enforce a mechanic's lien against property located at 302, 304, and 306 East Washington Street in Springfield (subject property).  In May 1999, when Construx entered into an agreement with John Shipley to make  certain improvements to the building located on the subject property, the property was under an installment sale contract between Shipley, as the purchaser, and defendant Bette Kaiserman, both individually and as a trustee, and her sons, defendants Donald L. Kaiserman and Herbert A. Kaiserman, as owners.  Following an October 2002 bench trial, the trial court entered an order foreclosing and enforcing Construx's mechanic's lien. 

The Kaisermans appeal, arguing that (1) the trial court erred by determining that they, as sellers under the installment sale contract, were "owners" under section 1 of the Mechanics Lien Act (Act), as opposed to lienholders under section 16 of the Act (770 ILCS 60/1, 16 (West 1998)); (2) section 16 of the Act, as applied, violates the equal protection clauses of the United States (U.S. Const., amend. XIV) and Illinois Constitutions (Ill. Const. 1970, art. I, §2); and (3) even accepting that they are "owners" under the Act, the court's finding that they authorized or knowingly permitted Construx to make the improvements was against the manifest weight of the evidence.  We affirm.

I. BACKGROUND

In October 1996, the Kaisermans entered into an installment land sale contract (hereinafter contract) with Shipley for the sale of the subject property.  The property consisted of a parcel of land and a three-story brick building, which housed three commercial units on the first floor (one of which Shipley was then leasing from the Kaisermans and operating as the Station House Tavern (hereinafter tavern)) and apartments on the second and third floors.  According to the payment terms of the contract, the total sale price was $275,000, and Shipley was to make a $30,000 down payment, pay $2,504.32 in monthly installments for a five-year period, and then pay the remaining balance in a lump sum.  

The contract also provided, in pertinent part, as follows:

"6.  [Shipley] agrees to cause no improvements to be made upon said premises costing in excess of $1,000.00 without first securing the written consent of the [Kaisermans].  [Shipley] shall further keep said premises free and clear of any valid mechanic's lien and shall hold [the Kaisermans] indemnified against any valid lien arising by reason of [Shipley's] possession of said premises.

7.  No failure on the part of the [Kaisermans] to enforce any right accruing to [the Kaisermans] because of any default of [Shipley] in failing to perform promptly any of the provisions hereof, no matter how many times such failure to enforce such rights may be repeated by the [Kaisermans], shall be construed to operate as a waiver of any of the provisions of this agreement, but the [Kaisermans] may at any time omit to take advantage of, or waive any default in any of the provisions hereof without prejudice to the [Kaisermans'] rights to enforce each and all of the provisions of this agreement with reference to any other or subsequent default."

The parties did not record the contract.

In May 1999, Shipley entered into an agreement with Construx to demolish the existing stairwell on the rear of the building and construct an exterior three-floor deck and staircase for a cost of $48,687.  In late July 1999, following the completion of those improvements, Shipley informed Bette that he was no longer able to make monthly payments on the contract due to financial difficulties.  At that time, the Internal Revenue Service had filed a $300,000 tax lien against Shipley, and Shipley had failed to pay 1998 property taxes (totaling $3,600).  The Kaisermans agreed to terminate the contract, and Shipley continued to operate the tavern as the Kaisermans' lessee.  

In August 1999, Construx recorded a $48,687 mechanic's lien against the property and Bette as owner.  In December 1999, Construx filed a complaint, seeking to foreclose and enforce the mechanic's lien.

At the October 2002 bench trial, Bette testified as an adverse witness that she acted as Donald and Herbert's agent in managing the property.  After she, Donald, and Herbert entered into the contract to sell the property to Shipley, she "very rarely" drove by the rear of the building.  She denied knowing that the rear stairs were in disrepair or observing Construx's construction on the rear of the building.  Bette could not recall whether she spoke with Doyle Finley, a tavern employee, about the construction while it was taking place.  She acknowledged speaking with a Construx employee but claimed that the conversation took place after the construction was completed.  Bette also acknowledged that sometime between May and June 1999, Shipley provided her with a copy of an appraisal of the property, which indicated, in pertinent part, that the "rear stairwell/fire escape [was] in need of substantial repair or replacement."  She further acknowledged that despite the language in paragraph six of the contract, she and Shipley had a verbal agreement that he could spend over $1,000 on the expansion and improvement of the tavern without first receiving the Kaisermans' written consent.  However, she denied having an agreement with him regarding other improvements to the property.

Finley testified that he worked as a janitor at the tavern during the time that Construx was completing the construction on the rear of the building.  On one occasion during that time period, Finley saw Bette at the rear of the building.  Bette saw the construction in progress, and Finley thought he remembered her commenting that it looked nice.  Bette did not express disapproval or object to the construction.  Finley did not think that the construction was "substantially completed" on that occasion.

Shipley testified as an adverse witness that after he entered into the contract with the Kaisermans, he began remodeling the tavern and expanding it to encompass two of the building's three commercial units.  Although Shipley spent around $30,000 on that project, he never received Bette's written consent.  Between late 1996 and July 1999, he also spent between $30,000 or $40,000 to repair and remodel some of the apartments without receiving Bette's written consent.  He acknowledged that he spent much of that money on new furnishings for the apartments.  Before Shipley entered into the October 1996 contract with the Kaisermans, Bette visited the building frequently.  After they entered into the contract, she did not visit as often. 

Shipley also testified that in May 1999, the City of Springfield informed him that the stairwell at the rear of the building was rotten and in disrepair and he had to immediately repair or replace it.  Shipley contacted Gary Sharp, Construx's director, and informed him that Shipley had a "major problem."  Sharp came to the building that same day, and Shipley later entered into an agreement with Construx to demolish the existing stairwell and construct an exterior three-floor deck and staircase at a cost of approximately $48,000.  During the construction, Shipley agreed to around $2,400 in additional gutter work on the rear of the building.  Construx completed the construction in early July 1999.  Shipley never paid the amount owed to Construx for the project.  

Shipley further testified that he did not tell Bette about the City's May 1999 inspection or his agreement with Construx.  He did not remember telling William Clutter, a private investigator hired by Construx, that (1) he and Bette had discussed the construction project toward the project's completion; (2) Bette never objected to the construction; and (3) Bette had been aware of other substantial improvements he had made to the building and had not objected, despite the fact that the cost of those improvements was over $1,000.  

Michael Suhadolnik, Construx's chief executive officer, testified that "probably near the end" of the construction project, he spoke via telephone with Bette, who he knew owned the building, and they discussed the project "to some extent."  During the conversation, Suhadolnik commented on Construx's response following the May 1999 inspection, and Bette thanked him.  He then told her that he "hoped everything was going to be taken care of," and she responded that it would be.  Suhadolnik "felt that it was a good phone call."  He acknowledged that in a prior affidavit, he stated that the telephone call with Bette took place after Shipley failed to pay Construx.   

Clutter testified that during a March 2001 interview with Shipley, Shipley stated that toward the end of the construction project, he talked with Bette about the construction.  During that conversation, Bette did not object to the construction project.  Shipley also told Clutter that during the construction project, Bette visited the building often and "kept herself aware of what was going on."

Sharp testified that in August 1999, he spoke with Bette and told her that he was concerned that Construx had not been paid for the construction project.  Bette told Sharp that she and Shipley "were trying to work out some things" and "they would take care of it."  Sharp thought Bette meant that she would pay for the construction project.  A few days later, Sharp received a handwritten note from Bette, stating, in pertinent part, that the "[b]uilding[s] are in [t]rust and [Bette] take[s] care of them."  Sharp thought the quoted language in the note meant that Bette would take care of the payment due Construx.  

William Shomidie, Construx's chief financial officer, testified that the bill Construx sent to Shipley was dated July 15, 1999.  He acknowledged that Construx never sent Bette a bill for the construction project.

Bette testified on her own behalf that she did not authorize Shipley to enter into the May 1999 agreement with Construx.  She denied telling Sharp that she would pay for the construction project.  When Bette told Sharp that she "would take care of it," she meant that she would see her lawyer.  Bette thought that she talked with Suhadolnik after the construction was completed.  She also denied telling Suhadolnik that she would pay for the construction project.  Bette further stated that Finley's testimony was not truthful.   

David Gold, who rented the third commercial unit in the  building, testified that after the Kaisermans and Shipley entered into the contract, Bette did not visit the building as often.  

After considering the evidence and counsels' arguments, the trial court took the matter under advisement and allowed the parties to submit posttrial briefs.  In October 2002, both parties did so, and the Kaisermans later filed a reply brief.  In November 2002, the court found in Construx's favor, stating, in pertinent part, as follows:

"It is clear that under the law in Illinois, the [Kaisermans] had an ownership interest in the property in question at the time [Construx] was doing the construction called for under the agreement it had with [Shipley].  Based on the testimony at trial, the [c]ourt is convinced that [Bette] knew of the construction taking place, permitted that construction[,] and at no time objected to the improvements being made."  

In December 2002, the Kaisermans filed a motion to reconsider or vacate the court's order, which the court later denied.  In January 2003, the court entered a written judgment in foreclosure and sale, finding that the Kaisermans owed Construx $67,598.08, which included $50,587 for the construction project, $16,604.28 in interest, and $406.80 in court costs. 

This appeal followed.           

                        

II. ANALYSIS

A. Bette's Status Under the Act

The Kaisermans first argue that Bette was not an "owner" of the property under section 1 of the Act (770 ILCS 60/1 (West 1998)).  Instead, they contend that pursuant to the doctrine of equitable conversion, Bette was a lienholder or incumbrancer.  The Kaisermans thus claim that under section 16 of the Act (770 ILCS 60/16 (West 1998)), they were responsible only for the reasonable value of the improvements to the property, as opposed to the full contract price.  We disagree.  

Section 1 of the Act provides, in pertinent part, as follows: 

"Any person who shall by any contract or contracts, express or implied, or partly expressed or implied, with the owner of a lot or tract of land, or with one whom the owner has authorized or knowingly permitted to contract, to improve the lot or tract of land *** has a lien upon the whole of such lot or tract of land."  770 ILCS 60/1 (West 1998).   

That section also provides that a mechanic's lien "extends to an estate in fee, for life, for years, or any other estate or any right of redemption, or other interest which the owner may have in the lot or tract of land at the time of making such contract or may subsequently acquire."  770 ILCS 60/1 (West 1998).  Section 16 of the Act provides, in pertinent part, as follows:  

"No incumbrance upon land, created before or after the making of the contract under the provisions of this act, shall operate upon the building erected, or materials furnished until a lien in favor of the persons having done work or furnished material shall have been satisfied, and upon questions arising between incumbrancers and lien creditors, 
all
 
previous
 
incumbrances
 
shall
 
be
 
preferred
 
to
 
the
 
extent
 
of
 
the
 
value
 
of
 
the
 
land
 
at
 
the
 
time
 
of
 
making
 
of
 
the
 
contract
, 
and
 
the
 
lien
 
creditor
 
shall
 
be
 
preferred
 
to
 
the
 
value
 
of
 
the
 
improvements
 
erected
 
on
 
said
 
premises
."  (Emphasis added.)  770 ILCS 60/16 (West 1998). 

In this case, the importance of these sections is the following.  If (1) Bette is treated as an "owner" of the property under section 1 of the Act, and (2) she knowingly permitted or authorized the construction to take place, then the Kaisermans' interest in the property was subject to the full amount of Construx's mechanic's lien, which reflected the contract price.  On the other hand, under the Kaisermans' theory, if Bette is treated as an lienholder under section 16 of the Act, the Kaisermans' interest in the property was subject only to an amount reflecting the reasonable value of the improvements to the property.    

1. 
Our
 
Supreme
 
Court's
 
Decisions
 
in
 

Hickox, 
Henderson, 
and
 Paulsen

Our decision is controlled by our supreme court's decisions concerning mechanic's liens in 
Hickox v. Greenwood
, 94 Ill. 266 (1880), 
Henderson v. Connelly
, 123 Ill. 98, 14 N.E. 1 (1887), and 
Paulsen v. Manske
, 126 Ill. 72, 18 N.E. 275 (1888), which we must follow.

In 
Hickox
, the supreme court addressed and rejected the same argument the Kaisermans now raise on appeal.  Virgil Hickox, the owner of certain property, entered into an installment land sale contract with David Peat, the purchaser.  Peat later entered into a contract with a builder to build a house on the property without Hickox's knowledge.  
Hickox
, 94 Ill. at 267.  The builder completed the work and later filed a petition to enforce a lien.  
Hickox
, 94 Ill. at 268.  The trial court directed Peat to pay the amount owed on the mechanic's lien, and on his failure to do so, ordered the house and property to be sold for the payment of the lien and other costs.  On appeal, the builder, relying on what is now section 16 of the Act, argued that Hickox's interest in the property, as the owner-seller, was in the nature of a lien or incumbrance.  The supreme court expressly rejected this argument, holding that Hickox's interest in the property did not constitute a mere lien or incumbrance.  
Hickox
, 94 Ill. at 268.  Thus, contrary to the Kaisermans' claim, Bette's interest in the property did not constitute a lien or incumbrance. 

In 
Henderson
, Charles and W.S. Henderson, the owners of certain property, entered into an installment land sale contract with John Sharp, the purchaser.  
Henderson
, 123 Ill. at 100, 14 N.E. at 2.  The contract contemplated that Sharp would build a house on the property and the Hendersons would advance a certain amount of money to assist him.  Sharp later entered into a contract with a builder to perform certain work on the house.  The builder performed the work and later filed a petition to enforce a lien.  At some later point, Sharp defaulted on the installment contract, and the Hendersons took possession of the property.  
Henderson
, 123 Ill. at 101, 14 N.E. at 2.  The trial court entered an order requiring the Hendersons and Sharp to pay the builder the amount he was entitled to on the lien.  
Henderson
, 123 Ill. at 99-100, 14 N.E. at 1.  

On the Hendersons' appeal, the supreme court reaffirmed its decision in 
Hickox
 but concluded that 
Hickox
 was factually distinguishable.  The 
Henderson
 court noted that in 
Hickox
, the seller "did not authorize or in any manner empower the purchaser to erect a building on the premises."  
Henderson
, 123 Ill. at 102, 14 N.E. at 3.  "Under such circumstances, of course[,] the lien of the mechanic would only attach to such title as the purchaser held."  
Henderson
, 123 Ill. at 102, 14 N.E. at 3.  In contrast, the Hendersons had authorized Sharp to build a house on the property.  The 
Henderson
 court thus held that the mechanic's lien could attach to the Hendersons' interest in the property.  In so holding, the court stated, in pertinent part, as follows:

"If, therefore, the Hendersons authorized and empowered Sharp, the purchaser, to cause a building to be erected on property where the legal title was in them, upon what ground can they now, after the labor has been expended and materials furnished, claim that the mechanic who furnished the labor and materials which they, by the contract, authorized, shall look alone to the title held by the purchaser?  Certainly no principle of equity or fair dealing would sanction a precedent of that character."  
Henderson
, 123 Ill. at 103, 14 N.E. at 3.  

In 
Paulsen
, 126 Ill. at 75, 18 N.E. at 276, the supreme court reaffirmed its decisions in 
Hickox
 and 
Henderson
, and held that an "owner of [a] lot or piece of land," as that phrase is used in section 1 of the Act, means the "owner of any interest or estate in such lot or land."  The court also held that when the seller of property under such a contract agrees and authorizes the purchaser under that contract to make improvements to the property, the seller's interest in the property is subject to the mechanic's lien.  
Paulsen
, 126 Ill. at 78, 18 N.E. at 277.  The court reasoned that under such circumstances, the owner-seller "can not [
sic
] be permitted to receive the benefit and escape the liability of the mechanic's lien attaching to their interest."  
Paulsen
, 126 Ill. at 78, 18 N.E. at 277.   

Our supreme court's holdings in 
Hickox
, 
Henderson
, and 
Paulsen
 constitute that court's latest holdings regarding (1) whether a seller of property under an installment contract is considered a lienholder or incumbrancer under section 16 of the Act, as opposed to an owner under section 1; and (2) the circumstances under which the interest of such an owner-seller is subject to a mechanic's lien. 

2. 
Our
 
Supreme
 
Court's
 
Decision
 
in
 Shay

The Kaisermans contend that the supreme court repudiated its holdings in 
Hickox
 and 
Henderson
 when it decided 
Shay v. Penrose
, 25 Ill. 2d 447, 185 N.E.2d 218 (1962).  We disagree.

In 
Shay
, 25 Ill. 2d at 448, 185 N.E.2d at 219, the supreme court discussed the doctrine of equitable conversion in the context of a partition action.  In that case, Carol Shay individually bought six parcels of land during her lifetime.  She later entered into installment land sale contracts with separate purchasers of four of those parcels.  Thereafter, she died intestate and was survived by her husband and her sister.  The husband sought to partition the two unsold parcels of land, and the sister counterclaimed, alleging that the four parcels sold under contract should also be partitioned.  
Shay
, 25 Ill. 2d at 448, 185 N.E.2d at 219.  The trial court determined that equitable conversion had occurred when the installment land sale contracts were entered into and thus the four parcels were not subject to partition by Shay's heirs.  
Shay
, 25 Ill. 2d at 449, 185 N.E.2d at 219.  The supreme court affirmed, holding that upon Shay's death, her husband became entitled to the unpaid balance of the purchase prices.  
Shay
, 25 Ill. 2d at 451, 185 N.E.2d at 220-21.  In so holding, the court discussed the doctrine of equitable conversion as follows:            

"Equitable conversion is the treating of land as personalty and personalty as land under certain circumstances.  Hence, as between the parties and those claiming through them, when the owner of land enters into a valid and enforceable contract for its sale he continues to hold the legal title, but in trust for the buyer; and the buyer becomes the equitable owner and holds the purchase money in trust for the seller.  The conversion takes place at the time of entering into the contract.  It stems from the basic equitable principle that equity regards as done that which ought to be done."  
Shay
, 25 Ill. 2d at 449, 185 N.E.2d at 219-20.  

The supreme court also noted that it had not consistently applied  the doctrine in its prior decisions and traced the inconsistency to language in 
Chappell v. McKnight
, 108 Ill. 570 (1884).  The 
Shay
 court thus expressly overruled 
Chappell
 and those decisions following 
Chappell
 to the extent they did not apply the doctrine.  The 
Shay
 court then explicitly declined the appellant's request to set forth a "definitive rule of application of the doctrine in the several fields where it may be invoked."  
Shay
, 25 Ill. 2d at 450, 185 N.E.2d at 220.  In so doing, the court stated as follows:  "The issue here presented is devolution of title at the death of the seller[,] and we concern ourselves in this opinion only with that issue."  
Shay
, 25 Ill. 2d at 450, 185 N.E.2d at 220.

Contrary to the Kaisermans' contention, the 
Shay
 decision did not abrogate 
Hickox
, 
Henderson
, or 
Paulsen
.  As stated above, the 
Shay
 court limited its decision to the issue then before it, which did not involve whether the interest of a seller under an installment land sale contract was subject to a mechanic's lien.  In addition, neither 
Hickox
, 
Henderson
, nor 
Paulsen
 was among those decisions that the 
Shay
 court expressly overruled.

If the doctrine of equitable conversion had no limitations, we might be inclined to agree that the supreme court's decision in 
Shay
 repudiated the underlying premise of 
Hickox
, 
Henderson
, and 
Paulsen
.  However, that is simply not the case.  "The doctrine of equitable conversion is a fiction, and its application is limited to the extent necessary to accomplish equity."  
City of Chicago v. Salinger
, 384 Ill. 515, 520, 52 N.E.2d 184, 187 (1943); see also 
Cox v. Supreme Savings & Loan Ass'n
, 126 Ill. App. 2d 293, 295, 262 N.E.2d 74, 76 (1970) (the doctrine was designed to accomplish the parties' intent and ensure justice where technical rules of law might prevent it).  Thus, the doctrine does not apply where it interferes with other equitable considerations or violates the intentions of the parties of the sales contract.  
Eade v. Brownlee
, 29 Ill. 2d 214, 217, 193 N.E.2d 786, 788 (1963).  Similarly, the doctrine does not apply if it would circumvent or avoid established principles of law and public policy.  
Letsos v. Century 21-New West Realty
, 285 Ill. App. 3d 1056, 1068, 675 N.E.2d 217, 226 (1996).  

Because (1) we are bound by 
Hickox
, 
Henderson
, and 
Paulsen
, (2) the supreme court's decision in 
Shay
 did not abrogate them, and (3) the doctrine of equitable conversion does not supersede those holdings, we reject the Kaisermans' argument that Bette was a lienholder under section 16 of the Act (770 ILCS 60/16 (West 1998)), as opposed to an owner under section 1 (770 ILCS 60/1 (West 1998)).  

B. The Kaisermans' Equal Protection Claim 

The Kaisermans also argue that section 16 of the Act (770 ILCS 60/16 (West 1998)), as applied, violates the equal protection clauses of the United States (U.S. Const., amend. XIV) and Illinois Constitutions (Ill. Const. 1970, art. I, §2).  Specifically, they contend that as construed by Construx, section 16 provides that all previous incumbrancers, except installment land sale contract sellers, "shall be preferred," thus treating owner-seller lienholders differently from other lienholders with no rational basis.  The Kaisermans' argument is premised on their assertion that a seller under an installment land sale contract is a lienholder, which we earlier rejected.  Thus, we need not address this argument.     

C. The Trial Court's Finding That Bette Knowingly 

Permitted the Construction To Take Place

Last, the Kaisermans argue that the trial court's finding that Bette knowingly permitted the construction to take place was against the manifest weight of the evidence.  We disagree.

Section 1 of the Act provides, in pertinent part, as follows:

"Any person who shall by any contract or contracts, express or implied, or partly expressed or implied, with the owner of a lot or tract of land, or with one whom the owner has authorized or knowingly permitted to contract, to improve the lot or tract of land *** is known under this Act as a contractor, and has a lien upon the whole of such lot or tract of land *** for the amount due to him for such material, fixtures, apparatus, machinery, services or labor, and interest at the rate of 10% per annum from the date the same is due."  770 ILCS 60/1 (West 1998).

Thus, a contract for improvements must either have been made with the owner of the property or with one whom the owner has authorized or knowingly permitted to have done the work.  The owner is presumed "to have 'knowingly permitted' the improvements where he knew and failed to protest or accepted the benefits of the improvements."  
Miller v. Reed
, 13 Ill. App. 3d 1074, 1077, 302 N.E.2d 131, 133 (1973).    

"A reviewing court should not overturn a trial court's findings merely because it does not agree with the lower court or because it might have reached a different conclusion had it been the fact finder.  The trial judge, as the trier of fact, is in a position superior to a reviewing court to observe witnesses while testifying, to judge their credibility, and to determine the weight their testimony should receive.  Consequently, where the testimony is conflicting in a bench trial, the trial court's findings will not be disturbed unless they are against the manifest weight of the evidence.  [Citation.]  A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence."  
Bazydlo v. Volant
, 164 Ill. 2d 207, 214-15, 647 N.E.2d 273, 276-77 (1995). 

See 
Eychaner v. Gross
, 202 Ill. 2d 228, 251, 779 N.E.2d 1115, 1130 (2002) ("In close cases, where findings of fact depend on the credibility of witnesses, it is particularly true that a reviewing court will defer to the findings of the trial court unless they are against the manifest weight of the evidence"); see also 
Chandler v. Maxwell Manor Nursing Home, Inc.
, 281 Ill. App. 3d 309, 318, 666 N.E.2d 740, 747 (1996) (in determining whether the trial court's findings were against the manifest weight of the evidence, a reviewing court "may not reconsider the evidence or reassess the witnesses' credibility or demeanor").

In this case, the evidence regarding whether Bette authorized or knowingly permitted the construction project was conflicting.  Bette testified that (1) after she, Donald, and Herbert entered into the contract to sell the property to Shipley, she "very rarely" drove by the rear of the building; and (2) she knew nothing about the construction project until after it was completed.  In addition, Shipley testified that he did not tell Bette about his agreement with Construx.  In contrast, other evidence showed the following:  (1) between May and June 1999, Shipley provided Bette with a copy of an appraisal of the property, which indicated that the "rear stairwell/fire escape [was] in need of substantial repair or replacement"; (2) on one occasion before the construction was "substantially completed," Finley had a conversation with Bette at the rear of the building, during which Bette saw the construction in progress and did not express her disapproval or object; (3) during a March 2001 interview with Clutter, Shipley stated that (a) during the construction project, Bette visited the building often and "kept herself aware of what was going on," and (b) toward the end of the construction project, Shipley talked with Bette about the construction, and Bette did not object to the construction; and (4) during an August 1999 conversation between Sharp and Bette about his concern that Construx had not been paid for the construction project, Bette stated that she and Shipley "were trying to work out some things" and "they would take care of it."  

We have carefully reviewed the record in accordance with the appropriate standard of review, and we conclude that the trial court's finding that Bette knowingly permitted the construction to take place was not against the manifest weight of the evidence.  

In so concluding, we note that the Kaisermans make much of the fact that no evidence showed that Bette knowingly permitted the construction at the initiation of the project.  The Kaisermans suggest that at the point that Bette knew of the construction project, "no effective action could be taken by [Bette] to protect herself."  We are not persuaded.  When Bette first learned of the construction project, she could have then informed both Shipley and Construx that she was neither authorizing nor permitting the construction project to take place.  

III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

KNECHT, P.J., and TURNER, J., concur.