2020 IL App (2d) 180896-U
No. 2-18-0896
Order filed January 21, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| RICKY DAVIS AND STATELINE REALTY-REALINGTON ENTERPRISES, LLC, | ) ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | No. 18-MR-338 |
| ILLINOIS DEPARTMENT OF FINANCIAL AND PROFESSIONAL REGULATION; and KREG ALLISON, DIRECTOR OF THE DIVISION OF REAL ESTATE, | ) ) ) ) ) | Honorable |
| Defendants-Appellees. | ) ) | Lisa R. Fabiano, Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Hudson and Bridges concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The Director did not err in determining that the realtor violated the Illinois Real Estate License Act by incorrectly representing that he and his company owned and had the right to sell certain real property. Also, the administrative law judge properly exercised his discretion and his role as fact finder in limiting cross-examination and in affording the testimony of certain witnesses more weight than others.

¶ 2    Following a hearing conducted by an administrative law judge (ALJ) and review by the

Illinois Real Estate Administration Disciplinary Board (Board), defendants-appellees, the Illinois

Department of Financial and Professional Regulation (Department) and Kreg Allison, as the Director of the Division of Real Estate (Director), determined that plaintiffs-appellants, Ricky Davis and his company, Stateline Realty-Realington Enterprises, LLC (Realington), violated several provisions of the Illinois Real Estate License Act of 2000 (Act) (225 ILCS 454 /1 *et seq.* (2018)). The violations were based on the manner in which Davis handled two separate real properties: (1) the Wishart property (where Davis had misrepresented himself as the owner of the property on the real estate listing when, in fact, he was merely the purchaser of an installment contract for the deed to the property); and (2) the Broadway property (where, among other violations, Davis forged the owner's signature on several documents necessary to list and sell the property). The Director indefinitely suspended Davis's real estate license for a minimum period of two years, fined Davis $10,000, and fined Realington $4000. The circuit court affirmed the Director's decision.

¶ 3    Davis and Realington appeal. As to the Wishart property, they argue that the doctrine of equitable conversion excused Davis's actions. As to the Broadway property, they argue that the ALJ abused his discretion when he limited the cross-examination of two witnesses and when he rejected the testimony of an expert witness. For the reasons that follow, we disagree with these arguments. Affirmed.

¶ 4                                  I. BACKGROUND

¶ 5                          A. The Administrative Complaint

¶ 6    On September 26, 2016, the Department filed a 12-count administrative complaint against Davis and Realington. Briefly, counts I through IV concerned the Wishart property, a single-family residence owned by Charles Pernacciaro. Count I alleged that Davis and Realington did not have a valid listing agreement or any other form of written consent from Pernacciaro to sell

the property, violating sections 20-20 (a)(9), (10), and (21) of the Act. Count II alleged that Davis and Realington did not obtain Pernacciaro's signature on the agreement for sale, instead incorrectly representing Davis as the owner, violating section 20-20 (a)(40) of the Act. Count III alleged that Davis and Realtington entered into a contract for sale before obtaining title to the property, violating sections 20-20 (a)(10), (12), and (21) of the Act. Count IV alleged that Davis hid the true value of the property to obtain a tax benefit by allocating more than 20% of the total price to unspecified personal property within the home, violating section 20-20 (a)(10), (12), and (21) of the Act.

¶ 7     Counts V through XII concerned the Broadway property, a multi-family real property owned by Todd and Dawn Gile. Count V alleged that Realington signed a management agreement before it was licensed, violating sections 20-10 and 20-20(a)(6) of the Act. Count VI alleged that Davis facilitated Realington in acting without a license, violating section 20-10(a)(40) of the Act. Count VII alleged that the management agreement contained an automatic renewal clause, violating section 10-25 of the Act. Counts VIII and IX alleged that Davis forged Todd Gile's signature on certain documents (the disputed documents), violating sections 20-20 (a)(12), and (21) of the Act. Count X alleged that, due to the forgery, Davis and Realington listed the property without a valid listing agreement, violating sections 20-20 (a)(9), (10), (21) of the Act. Count XI alleged that Davis listed the property when it was listed with another realtor, Baird & Warner, this allegation being tied to the forgery allegation, because the forged listing was not valid *vis a vis* the authentic Baird & Warner listing, violating sections 20-20 (a)(9), (10), and (21) of the Act. Count XII alleged that Davis acted as a broker in his own interest and in the interest of his future company, Realington, when he was still sponsored by Century 21, violating sections 20-10 (a), and 20-20 (a)(15) of the Act.

¶ 8                          B. The Administrative Hearing

¶ 9                             1. The Wishart Property

¶ 10    The Department's theory of the case concerning the Wishart property was as follows. In 2013, Davis entered into an agreement for deed for the property in the form of a five-year installment contract. Originally, both Pernacciaro and his wife owned the property. However, one month into the five-year term, she transferred her interest to Pernacciaro. The installment contract provided that Davis make monthly payments to Pernacciario toward the $90,000 purchase price. It also provided that the property could not be assigned, conveyed, or resold by Davis without first obtaining Pernacciario's written consent, and that Davis would obtain the deed to the property only upon his performance of all its terms and conditions. Nevertheless, just three years into the term, in March 2016, Davis listed the property for sale without first obtaining Pernacciario's written permission. Davis did not list Pernacciario as the owner when listing the property for sale or on an eventual purchase contract between Davis and Henry Tran. That sale never closed, and Pernacciario did transfer title to Davis shortly before Davis sold the property to the ultimate buyer, Kimberly Chew. Davis committed the wrongdoing prior to the ultimate sale.

¶ 11    In testifying, Davis did not dispute many of the facts alleged by the Department. In fact, he admitted that represented himself to potential buyers as the owner of the property and that he did not seek Pernacciario's written permission to list the property. He simply believed that the installment contract allowed him to do so, as long as he continued to make the monthly payments. He could not point to any provision in the contract that stated as much. (Davis's testimony concerning whether he hid the true value of the property to obtain a tax benefit, count IV, is not relevant to the instant appeal. Count IV is the one count for which the ALJ would determine the Department did not prove its case.)

¶ 12                                    2. The Broadway Property

¶ 13    The Department's theory of the case concerning the Broadway property is as follows. In February 2013, Davis entered into a management agreement with Gile. The agreement contained an automatic renewal clause. Under the agreement, Davis would handle the leases and rents. However, at that time, Davis was still sponsored by Century 21, and Realington was not yet licensed. Davis did not perform the management services in conjunction with his sponsoring agency, Century 21. Instead, he performed services to benefit himself and his newly forming company, Realington.

¶ 14    In June 2013, Gile decided that he wanted to sell the property, and Davis listed the property for sale. Davis was still with Century 21. Davis forged the signature on the listing agreement, and Gile was not aware that Century 21 was involved.

¶ 15    In December 2013, Davis told Gile that he was starting his own agency, Realington. However, Davis never obtained Gile's signature to transfer the listing from Century 21 to Realington. Instead, Davis forged Gile's signature on the transfer agreement.

¶ 16    Finally, in June 2014, when the listing agreement was set to expire, Davis forged Gile's signature on an extension agreement (also referred to by the parties as a status report). In fact, Gile did not want to continue working with Davis. Gile signed a new agreement with Shannon Long at Baird & Warner, not aware that Davis had continued to list the property.

¶ 17    Davis denied that he forged the disputed documents (the June 2013 listing agreement, the December 2013 transfer agreement, and the June 2014 extension agreement). Davis did not dispute other facts: the management agreement clearly contained an automatic renewal clause, and the timing of Realington's licensure spoke for itself.

¶ 18    On the question of forgery, the Department called the following witnesses: Gile, Long, Lea Madison, and Jamie Condor. Davis testified on his own behalf. He also called two current employees, Joy Bullard and Tonya Martinovich, as well as a handwriting expert, Warren Spencer.

¶ 19                                  i. Department Witnesses

¶ 20    Gile testified that he and Davis were good friends and golf buddies. Gile trusted Davis. Davis had assisted Gile in other real estate transactions. Originally, Gile gave Davis the Broadway listing. Later, in December 2013, Davis told Gile he was leaving Century 21 to start his own brokerage agency, Realington. Davis asked if he could transfer the listing to Realtington. Gile never knew Century 21 handled the Broadway property in the first place. Although Davis and Gile talked about it, Gile did not sign the transfer agreement.

¶ 21    Gile knew that the listing agreement with Davis was set to expire on June 10, 2014. He had decided that he would stop working with Davis and instead work with Long at Baird & Warner. Gile was shown a document dated June 9, 2014, the day before the listing agreement was set to expire. The document extended the term of the listing agreement with Realington and was purportedly signed by Gile. However, Gile testified that he never saw the document before, and he did not sign it.

¶ 22    Instead, on July 19, 2014, Gile entered into a contract with Baird & Warner, giving them the exclusive right to sell the property. He signed this document. When shown a copy of the Baird & Warner contract, he confirmed the authenticity of his signature.

¶ 23    Long, a licensed managing broker with Baird & Warner, testified that she handled the Broadway property for Gile. Under her management, the Broadway property sold within one month. Long has worked with Gile in the past, and she has seen his signature approximately 36 times. As to this case, she was present when Gile signed the listing agreement with Baird &

Warner, and she was also present when he signed the mold disclosure form in conjunction with the purchasing agreement. These Baird & Warner documents showed Gile's authentic signature.

¶ 24     Madison, a licensed real estate broker, worked for Davis during the relevant period. She testified that, at some point in 2014, Davis's listing for the Broadway property was set to expire. Davis had heard that Gile planned to transfer the listing to another agency, and he was "furious." Davis asked Madison to look for an extension agreement in Gile's file, but there was no extension agreement in the file. Later, Davis gave Madison a signed extension agreement and asked her to put it in the file. According to Madison, another employee, Bullard, was present when Davis asked Madison to put the extension agreement in the file.

¶ 25     During cross-examination, Davis, through counsel, asked Madison if she was involved in separate litigation with him, wherein Davis alleged that Madison had wrongfully procured his tax documents. Madison answered yes. *Her* attorney, who had filed an appearance and was present at the hearing, objected. He stated that Madison should not testify to unproven allegations. The ALJ agreed. He allowed Davis to restate the question, limiting the scope to "*the issue* involved in litigation without getting into specific allegations." (Emphasis added.) Davis accepted the ruling and declined the opportunity to restate the question: "Well, your Honor, I'm done with my questions. The purpose of which and the relevance of it was to establish prejudice and bias. That's all I was trying to do." Davis briefly circled back to the issue with a single, unfinished question, but he again immediately accepted the ALJ's limitation. He stated that he had no further questions.

¶ 26     Condor, a licensed real estate broker, also worked with Davis during the relevant period. Like Madison, she testified that Davis was very angry when he learned that Gile was going to list the Broadway property with another firm. Davis told Condor that he was going to sign Gile's

name on an extension agreement, explaining that Gile drank so much he would not know the difference. Condor witnessed Davis sign Gile's name on the extension agreement.

¶ 27     During cross-examination, Davis asked Condor if she had filed a personal injury lawsuit against Davis. The Department objected. The ALJ overruled the objection in part, explaining that the question went to bias, but instructing Davis to avoid specific allegations and limit the question to whether Condor and Davis were involved in separate litigation. Davis stated that he had no further questions.

¶ 28                                        ii. Davis's Witnesses

¶ 29     Davis testified that, in June 2013, Gile signed the Broadway listing agreement in his presence. He did not provide Gile with a copy of it. Later, he informed Gile that he would transfer the listing from Century 21 to Realington. In December 2013, Bullard provided Gile with the necessary transfer paperwork, but Davis was not present when Gile signed it. Similarly, Bullard provided Gile with the June 2014, extension agreement, but, again, Davis was not present when Gile signed it. Davis acknowledged that the June document omitted information that typically should be included, such as the amount of the commission, a complete description of the property (including the city and state), and the co-owner's signature (Dawn Gile). Davis did not know that Dawn co-owned the property.

¶ 30     Bullard, a realtor and leasing agent currently employed by Davis and Realington, testified that she helped manage the paperwork associated with the Broadway property. When Davis left Century 21 to form his own brokerage agency, the Broadway listing needed to be transferred to Realington. Gile signed the December 2013 transfer agreement in her presence, but she did not give Gile a copy of it. She was *not* present when Gile signed the June 2014 extension agreement.

If Davis were to lose his license, Bullard would find another job. However, she hoped to keep working for Davis.

¶ 31    Tonya Martinovich, a booking and leasing agent currently employed by Davis and Realington, testified that she was present when Gile signed the June 2014 extension agreement. Gile did not request a copy, and she did not provide one. She remembers that day in particular, because, ordinarily, she did not handle the real estate side of the business. She was only filling in for Bullard. She loves working for Davis, and, if he lost his license, she would lose her job.

¶ 32    Finally, Warren Spencer, a forensic document examiner, testified to the authenticity of Gile's signature on the disputed documents. Spencer is employed by LS Spencer & Associates, and, although he holds a bachelor's degree in science, is self-taught in handwriting analysis. He is not certified by the National Association of Document Examiners. He is, however, a member of that same group, as well as a member of the scientific association for forensics examiners. He is a certified fraud examiner. He has testified as a courtroom expert approximately 30 times.

¶ 33    Spencer received examples of Gile's signature solely from Davis's attorney. Spencer was shown the Baird & Warner documents, which Gile had admitted to signing, just prior to testifying and/or while testifying.

¶ 34    Spencer did not describe his methodology in his report. However, in testifying, he explained that, first, he looked for "running patterns." Next, he looked for variation within a known individual; some individuals vary their signatures more than others. Given this methodology, Spencer opined that the documents provided by Davis's attorney were all signed by the same person and that the Baird & Warner documents were signed by that person as well.

¶ 35    Spencer further testified that he had seen six or seven court documents that had been signed by Gile, but Spencer did not describe these documents or include samples of them in his report.

Spencer did not meet with Gile or obtain an independent verification of his signature. Spencer conceded that the industry standard is to receive at least 12 known samples of a person's writing, that some courts have required him to have 20 to 25 samples, and that he did not have near that many in this case.

¶ 36                    3. ALJ's Report and Recommendation to the Board

¶ 37    As to the Wishart property, the ALJ determined that the Department proved counts I, II, and III by clear and convincing evidence. There was no evidence that Davis had a listing agreement or written consent from Pernacciaro or that he had obtained Pernacciaro's signature on the agreement for sale. To the contrary, all the evidence showed that Davis entered into a sales contract for the property when he did not hold title to the property, was not an owner of the property, and did not seek Pernacciaro's written permission to sell the property. (The ALJ determined that the Department did not prove count IV.)

¶ 38    As to the Broadway property and counts VIII, IX, X, and XI, which turned on the question of forgery, the ALJ determined that the Department proved by clear and convincing evidence that Gile signed the Baird & Warner documents, but Gile did not sign the disputed documents. The court explained, "The ALJ is persuaded by Gile's testimony ***." Further:

> "Bolstering [Gile's testimony] is that to the naked eye the signatures on the [Baird & Warner documents] look nothing like the other signatures that are purported to be his on [the disputed documents]. The signatures on the Baird & Warner documents are the true signatures of [Gile] while the purported signatures on the disputed documents *appear to have been made by someone other than [Gile]*." (Emphasis added.)

Moreover, Dawn Giles did not sign any of the disputed documents, and Davis testified that he did not know that Dawn was a joint owner of the properties.

¶ 39    The ALJ made express credibility findings.  He found Gile to be "the most persuasive of all the witnesses presented" and the least biased.  "The ALJ can find no reason for [Gile] to be other than truthful as to the authenticity of which signatures are his and which were forged."  The ALJ acknowledged that many of the non-expert witnesses on both sides were biased.  Madison and Condor were biased, because they were involved in litigation with Davis.  Bullard and Martinovich were biased, because they wanted to keep their jobs with Davis.  Still, the ALJ found that the Department's witnesses, Long, Madison, and Condor, were "credible," and he found that Davis's witnesses, Bullard, Martinovich, and Davis himself, were "less persuasive."

¶ 40    The ALJ gave Spencer's expert testimony "little weight."  The ALJ explained:

"The report submitted by [Spencer] is nothing more than photocopies of the signatures tendered to him by [Davis] for review and [Spencer] was told that those are in fact signatures of [Gile].  The report contains no mention of any methodology used to determine why [Spencer] opined as he did.  Further the [Baird & Warner documents] were not included in the report ***.  The signatures [in one of these documents] was examined just prior to testifying and [the signature in the other], a document he had never seen before, was examined by [Spencer] while he was testifying."

¶ 41    As to the Broadway property and counts V, VI, VII, and XII, the ALJ determined that the Department proved its case by clear and convincing evidence.  As Davis virtually conceded, the Broadway management agreement was effective during a period when Realington was not licensed.  Davis himself facilitated Realington's violation.  Further, Davis was sponsored by Century 21 at the time, and he should have been performing services for Century 21, not Realington.  Also, the Broadway management agreement contained an automatic renewal clause, which is prohibited by law.

¶ 42    The ALJ recommended to the Board that Davis's and Realington's licenses be suspended for a minimum period of two years and that they be fined in the amounts of $5000 and $2000, respectively. The Board adopted the ALJ's findings of fact and conclusions of law, except with respect to fines. The Board considered Davis's violations to be "severe" and increased the fines to $10,000 and $4,000, respectively.

¶ 43                          C. Director's Ruling

¶ 44    Davis appealed to the Department and Director. He argued, *inter alia*, that: (1) the doctrine of equitable conversion excused his handling of the Wishart property; (2) the ALJ erred in limiting the cross-examination of Madison and Condor regarding the pending lawsuits; and (3) the ALJ improperly rejected Spencer's expert testimony. The Director rejected these arguments in a written order and kept in place the minimum two-year suspension and $10,000 and $4000 fines.

¶ 45    First, the Director noted that the equitable conversion case upon which Davis relied, *Shay v. Penrose*, 25 Ill. 2d 447 (1962), did not apply to the facts at hand. The doctrine of equitable conversion did not make Davis the title holder to the property. Rather, Davis would not hold title to the property until he completed all the terms of the installment contract, which required him to seek written permission before listing the property for sale.

¶ 46    Second, the Director determined that the ALJ acted within its discretion in limiting the cross-examination of Madison and Condor. As to Madison, the Director noted that the ALJ initially instructed only that Davis could not "get into the *specific* allegations of the complaint." (Emphasis added.) Rather than continue his line of questioning to focus on the general nature of the complaint, Davis stated that he had no further questions. Davis declined an opportunity to explore Madison's bias. Even so, in its recommendation, the ALJ had acknowledged that Madison and Condor were biased, so it is unclear what prejudice Davis suffered. Moreover, at no point

during either Madison's or Condor's testimony did Davis explain why it was necessary to explore the "nature and intensity" of the bias, the term used in *Winn v. Inman*, 119 Ill. App. 3d 386 (1983), relied upon by Davis.

¶ 47    Third, the Director determined that the ALJ did not improperly reject Spencer's expert testimony. It was the ALJ's role to evaluate Spencer's credibility. The ALJ provided reasons for rejecting Spencer's testimony. Moreover, the ALJ did not act improperly when he commented that, to his eye, the signatures on the Baird & Warner documents appeared to be signed by a different person than the disputed documents.

¶ 48    Davis filed a complaint for administrative review with the circuit court. The circuit court affirmed the Director's decision. This appeal followed.

¶ 49                                    II. ANALYSIS

¶ 50    On appeal, Davis argues, as he did below, that: (1) the doctrine of equitable conversion excused his handling of the Wishart property; (2) the ALJ erred in limiting the cross-examination of Madison and Condor; and (3) the ALJ improperly rejected Spencer's expert testimony. We note that these arguments address only counts I, II, III, VIII, IX, X, and XI. Davis has not addressed the other counts for which the Department was found to have proven its case: counts V, VI, VII, and XII. Thus, even if Davis were successful in persuading this court as to counts I, II, III, VIII, IX, X, and XI, Davis would still be subject to discipline for counts V, VI, VII, and XII, pertaining to the automatic renewal provision, Realington's license, and Davis's failure to act in the interest of his sponsoring agency, Century 21.

¶ 51    The Act gives the Department the authority to regulate the real estate profession to ensure that those licensed in Illinois comply with the relevant laws and demonstrate minimum competency and character requirements. See 225 ILCS 454/20-10, 20-20 (2018); *Gruwell v.*

*Illinois Department of Financial & Professional Regulation*, 406 Ill. App. 3d 283, 294 (2010). The Department's final administrative decision is subject to review under the Administrative Review Law articles of the Code of Civil Procedure. 735 ILCS 5/3-101 *et seq*. (West 2018). This court reviews the decision of the administrative body, not the circuit court. See, *e.g.*, *Robbins v. Department of State Police Merit Board*, 2014 IL App (4th) 130041, ¶ 40. Here, we review the Director's order and the ALJ's findings of fact and conclusions of law, to the extent that the ALJ's determinations were adopted by the Director. See, *e.g.*, *All American Title Agency, LLC, v. Department of Financial & Professional Regulation*, 2013 IL App (1st) 113400, ¶ 25.

¶ 52 The standard of review depends upon the question presented. *Id*. Generally, the question of whether Davis violated the various provisions of the Act presents a mixed question of fact and law, to be reviewed under the clearly-erroneous standard. *Gruwell*, 406 Ill. App. 3d at 290. A decision is clearly erroneous when the reviewing court is left with the definite and firm conviction that a mistake has been made. *AFM Messenger Services, Inc., v. Department of Employment Security*, 198 Ill. 2d 380, 395 (2001). Here, however, Davis is not challenging the overall determination that he violated the Act. Rather, as to the Wishart property, he concedes that he engaged in the alleged course of conduct, but he argues that the doctrine of equitable conversion saves that conduct from violating the Act. This narrower issue does not present a question of fact, only one of law, which we review *de novo*. See *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998). Similarly, as to the Broadway property, Davis challenges only certain aspects of the overall decision. Davis's claim that the ALJ erred in limiting the cross-examination of witnesses implicates the ALJ's discretion and will not result in a reversal absent an abuse of such, combined with demonstrable evidence of prejudice. See *Danigeles v. Illinois Department of Financial Regulation*, 2015 IL App (1st) 142622, ¶ 82. An ALJ abuses his or her

discretion when he or she acts in an arbitrary or capricious manner, or no reasonable person would agree with the decision. See *Windsor Clothing Store v. Castro*, 2015 IL App (1st) 142999, ¶ 48. Lastly, Davis's claim that the ALJ erred in rejecting Spencer's expert testimony presents a question of fact, and we will not upset the ALJ's decision unless it is against the manifest weight of the evidence. *Danigeles*, 2015 IL App (1st) 142622, ¶ 69.

¶ 53           A. The Wishart Property: Equitable Conversion Does Not Apply

¶ 54     Davis first argues that the doctrine of equitable conversion excuses his handling of the Wishart property, allowing him to represent himself as the owner and forgo obtaining Pernacciario's written permission before listing the property for sale. We agree with the Director that *Shay*, the case upon which Davis relies, is distinguishable. Instead, *Construx of Illinois, Inc., v. Kaiserman*, 345 Ill. App. 3d 847 (2003), and *City of Decatur v. Ballinger*, 2013 IL App (4th) 120456, are on point and show that the doctrine of equitable conversion does not apply to this case.

¶ 55     In *Shay*, an owner/seller executed four separate contracts for deed for four separate properties. Each contract was an installment contract, as in the instant case. Each purchaser submitted a down payment and worked toward completing a payment schedule while possessing the property. However, the final warranty deed would not be issued to the purchaser until receipt of the final payment. The seller could also cancel the contract if the purchaser failed to make the scheduled payments. A few years after executing the contracts, but before any of the purchasers had completed their final payments, the seller died intestate. The seller's sister sought to partition each of the properties so as to claim a one-half interest in each of them, the other half, in her view, apparently belonging to the seller's husband. The seller's husband, also the administrator of the estate, disagreed. He wanted the estate to continue the administration of the contracts begun by the seller.

¶ 56    The court agreed with the seller's husband. *Id*. at 451. It explained as follows. An equitable conversion had occurred at the time of the execution of the contracts such that the heirs of the seller could not seek partition of the properties. *Id*. at 449. Further:

> "Equitable conversion is the treating of land as personalty and personalty as land under certain circumstances. Hence, as between the parties and those claiming through them, when the owner of land enters into a valid and enforceable contract for its sale he continues to hold the legal title, but in trust for the buyer; and the buyer becomes the equitable owner and holds the purchase money in trust for the seller. The conversion takes place at the time of entering into contract. It stems from the basic equitable principle that equity regards as done that which ought to be done. The doctrine of equitable conversion has been recognized in Illinois, as it has in practically every other jurisdiction, since earliest times." *Id*.

Because the equitable conversion took place at the time of the contracts' execution, the administrator could then decide how to manage certain issues that had occurred over the term of the installment contract. *Id*. at 451. For instance, one purchaser was two months in arrears as of the seller's death. The administrator could decide whether to declare that contract in default. *Id*. Another purchaser wished to assign his interest in the property. The administrator could decide whether to give the written consent required by the contract to assign interest in the property. *Id*.

¶ 57    In Davis's view, *Shay* shows that an equitable conversion occurred at the time he and Pernacciaro signed the installment contract. As such, Davis became the equitable owner of the property, he could list himself and his company as the owners of the property, and he could sell the property without Pernacciaro's written permission. We disagree.

¶ 58 The *Shay* court expressly limited the application of its decision, stating, "the issue here presented is devolution of title at the death of the seller and we concern ourselves in this opinion only with that issue." *Id*. at 450. Thus, the *Shay* court was charged with deciding the narrow question of whether, upon the death of the seller, the buyer under the installment contract, rather than the seller's heirs, had an interest in the property as an equitable owner. *Id*. at 451.

¶ 59 Unlike *Shay*, the instant case does not concern whose interests prevail in the event of the death of the seller, the buyer's or the heirs' interest. To whatever extent *Shay* is applicable, *Shay* does not support Davis's position. *Shay* acknowledged that the seller, and later the administrator, continued to maintain legal title to the property, held in trust for the buyer until the buyer completed the terms of the agreement. *Id*. at 449. *Shay* held that the buyers under the installment contract continued to be held to its terms once receiving equitable ownership. *Id*. Again, if the buyer disregarded his or her obligation to timely pay installments, the administrator could declare the contract in default. *Id*. Even more relevant to the instant case, the buyer could not disregard his or her obligation to seek the seller's, and later the administrator's, written permission before assigning his or her interest in the property. *Id*. Thus, contrary to Davis's position, *Shay* actually supports that he must continue to seek Pernacciaro's written permission before assigning the property.

¶ 60 As explained in *Construx*, the doctrine of equitable conversion is to be applied only where necessary to accomplish equity and to effectuate the parties' contractual intent. *Construx*, 345 Ill. App. 3d at 856. "[T]he doctrine does not apply where it interferes with equitable considerations or violates the intention of the parties of the [installment] contract." *Id*. at 856-57.

¶ 61 Here, the doctrine of equitable conversion is not necessary to accomplish equity or effectuate the parties' contractual intent. To the contrary, it is equitable and in keeping with the

parties' contractual intent for Pernacciaro to retain ownership until complete performance of the installment contract and for Davis to seek Pernacciaro's written permission before listing the property for sale. As stated in *Ballinger*, typically, it is logical and equitable for the seller in an installment contract to retain ownership. *Ballinger*, 2013 IL App (4th) 120456, ¶ 36. This is because, until performance is complete, it is still possible for the buyers to default on the contract and lose all rights to the property. *Id.* Moreover, here, the express terms of the installment contract demonstrate the parties' intent that Davis seek Pernacciraro's written permission before listing the property for sale. The doctrine of equitable conversion may not be used to circumvent the express terms of the installment contract.

¶ 62                    B. The Broadway Property: Cross-Examination was Proper

¶ 63    Next, Davis challenges the ALJ's decision to limit Davis's cross-examination of Madison and Condor regarding their separate litigation with Davis. Davis contends that limiting the scope of his cross-examination infringed on the due-process rights afforded to him in an administrative hearing. A fair hearing includes the right to be heard, an impartial trier of fact, and the right to cross-examine adverse witnesses. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 92 (1992). Still, the right to cross-examine an adverse witness is not unlimited and an administrative agency can tailor the examination to the circumstances before it. *Village of Stickney v. Board of Treasurers of Police Pension Fund*, 347 Ill. 2d 845, 852-53 (2004). As we have stated, the ALJ has broad discretion in conducting the administrative hearing, and absent an abuse of that discretion, combined with demonstrable evidence of prejudice, we will not reverse. *Danigeles*, 2015 IL App (1st) 142622, ¶82; *Peterson v. Chicago Planning Comm'n*, 302 Ill. App. 3d 461, 466-67 (1998).

¶ 64　　Here, the ALJ did not abuse his discretion in limiting the scope of the cross-examination. This case is distinguishable from *Winn*, 119 Ill. App. 3d at 843, upon which Davis relies. In *Winn*, the plaintiff in a battery case wanted to cross-examine the defendant's employee regarding potential bias. The trial court denied the request, apparently reasoning that the mere revelation of employee status was sufficient to demonstrate bias. The plaintiff made an offer of proof to show that the employee's bias ran deeper than in a typical employer-employee relationship. That is, the defendant paid the employee in cash and did not prepare a W-2 form for him. The employee, in turn, knowingly failed to report the wages on his income tax return. Given this, the appellate court determined that the trial court erred in denying the plaintiff the opportunity to further explore the nature and intensity of the employee's bias and, thus, his credibility. *Id*.

¶ 65　　Unlike in *Winn*, Davis did not explain to the ALJ why it was necessary to explore the nature and intensity of Madison and Condor's bias. In fact, as to Madison in particular, Davis followed the ALJ's instructions without resistance, *agreeing* that the mere fact of Madison's lawsuit was sufficient to establish bias. "Well, your Honor, I'm done with my questions. The purpose of which and the relevance of it was to establish prejudice and bias. That's all I was trying to do." Even though Davis briefly circled back to the issue before being redirected by the ALJ, he never offered an explanation as to why he needed to further explore the bias and he never made an offer of proof. Moreover, we fail to see the prejudice. Davis does not point to any demonstrable evidence of prejudice. He merely states in a conclusory fashion that the ALJ's limitation resulted in prejudice. The ALJ recognized that Madison and Condor were biased, just as it recognized that Bullard and Martinovich were biased. As the ALJ did not abuse his discretion and as Davis was not prejudiced, we reject Davis's argument.

¶ 66　　　　　　　　　　C. The Broadway Property: Expert Testimony

¶ 67    Finally, Davis argues that the ALJ erred in rejecting the testimony of Spencer, Davis's expert witness who testified that Gile was the likely signor of the disputed documents. Davis contends that the ALJ provided no reason for rejecting Spencer's testimony that Gile signed the documents, and, instead, simply substituted his own, non-expert assessment that Gile did not sign the documents. We disagree.

¶ 68    The trier of fact may assess the credibility of an expert witness and assign weight to that witness accordingly. *Morus v. Kapusta*, 339 Ill. App. 3d 483, 492 (2003). As such, the trier of fact need not accept the expert's testimony and is free to reject the expert's opinion and conclusions. *Id.*; *Racky v. Belfor USA Group, Inc.*, 2017 IL App (1st) 153446, ¶ 112.

¶ 69    Here, contrary to Davis's position, the ALJ *did* provide reasons for rejecting Spencer's testimony. The ALJ noted that Spencer never studied a known, certified signature from Gile. Spencer had never himself witnessed Gile sign his name or viewed an independent sample of Gile's signature. Rather, Spencer only studied photocopied signatures purportedly by Gile that had been provided by plaintiff's counsel. Spencer examined one of the signatures for the first time on the stand, and then only briefly. Additionally, Spencer's report did not sufficiently outline his methodology. It is true that Spencer explained his methodology while testifying, but the ALJ was not required to accept it as valid. As Spencer admitted, he utilized far fewer comparison samples than typically required by industry standards. The ALJ's rejection of Spencer's testimony was not arbitrary, and we defer to it.

¶ 70    We also reject Davis's implication that the ALJ improperly acted as a handwriting expert when he observed that the signatures in question "appeared" to have been made by someone other than Gile. Davis takes the ALJ's statement out of context. The ALJ made the statement in reference to Gile's credibility, not Spencer's. "Bolstering *Gile's* testimony is that to the naked

eye…" (Emphasis added.) In any case, the ALJ did not act improperly. In *Hoxha v. LaSalle National Bank*, 365 Ill. App. 3d 80, 85 (2006), for example, the trial court rejected the expert's testimony that the signature in question was authentic. The trial court observed that the signature did not favorably compare to samples provided. The appellate court determined that a trial court is free to make its own observations of the signature and, in conjunction with its impressions of the other evidence, decide whether the signature is authentic. *Id.* That is exactly what the ALJ did here.

¶ 71                                III. CONCLUSION

¶ 72    For the reasons stated, we affirm the Director's decision.

¶ 73    Affirmed.